DAVID F. FAUSTMAN, State Bar No. 081862
CRISTINA K. OLIVELLA, State Bar No. 246156
FOX ROTHSCHILD LLP
235 Pine Street, Suite 1500
San Francisco, California 94104
Tel:  415-364-5540
Fax: 415-391-4436
dfaustman@foxrothschild.com
colivella@foxrothschild.com

Attorneys for Defendants
MEDICIS PHARMACEUTICAL CORPORATION and
ROBERT NEVIN

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMBERLEA MCMANIGAL, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>MEDICIS PHARMACEUTICAL CORPORATION, a Delaware corporation, ROBERT NEVIN, an individual,<br><br>Defendants. | Case No. 3:07-cv-04874 TEH<br><br>**NOTICE OF MOTION AND MOTION FOR ORDER COMPELLING ARBITRATION AND DISMISSING THE ACTION, OR ALTERNATIVELY, STAYING ACTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION; DECLARATIONS OF DEBI HEILEMAN, CRISTINA OLIVELLA, AND EXHIBITS 1 - 6**<br><br>Date:  February 25, 2008<br>Time:  10:00 a.m.<br>Courtroom: 12, 19th Floor<br><br>Complaint filed:  July 23, 2007 |

FOX ROTHSCHILD LLP
235 PINE STREET
SUITE 1500
SAN FRANCISCO, CA 94104

WCI 21386v1 01/21/08

MOTION TO COMPEL ARBITRATION

**TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on February 25, 2008 at 10:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 12, 19th Floor of the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendants MEDICIS PHARMACEUTICAL CORPORATION and ROBERT NEVIN, will bring on for hearing their motion for an order compelling arbitration and dismissing the action, or alternatively, staying the action pending the outcome of the arbitration, in the above-captioned action. Defendants Medicis Pharmaceutical Corporation ("Medicis") and Robert Nevin ("Nevin") hereby allege:

1. Plaintiff Kimberlea McManigal began her employment with Defendant Medicis on August 8, 2005. Defendant Nevin was Plaintiff's supervisor.

2. On February 5, 2007, Plaintiff entered into an agreement with Medicis and its employees whereby she was granted an award of stock under the Medicis Stock Incentive Plan (the "Agreement"). In the Agreement, Defendants and McManigal voluntarily promised and agreed to submit to binding arbitration any and all claims covered by the Agreement, and agreed that binding arbitration pursuant to this Agreement would be the sole, exclusive, and final remedy for resolving any such claims and disputes. (*See* Exhibit ("Ex.") 1.)

3. Paragraph 11 and its subparts (A) – (D) of the Agreement provide for arbitration of any dispute that might arise under the Agreement. Paragraph 11, subparts (A) and (B) of the Agreement describe the scope of claims subject to arbitration.

4. Plaintiff electronically accepted this Agreement. (*See* Ex. 2; *see also* Stock Option Agreement, Ex. 3.)

5. This motion involves a dispute between citizens of different states. Defendant Medicis is a corporation incorporated in the State of Delaware with its principal place of business in the State of Arizona. Defendant Nevin is a citizen of the State of New York. Plaintiff is a

FOX ROTHSCHILD LLP
235 PINE STREET
SUITE 1500
SAN FRANCISCO, CA 94104

WCI 21386v1 01/21/08

1    citizen of the State of California. The amount in controversy exceeds $75,000.00.

2    Jurisdiction is, therefore, proper under 28 U.S.C. § 1332.

3    6. On July 23, 2007, Plaintiff filed a complaint in California alleging discrimination on the

4    basis of sex in violation of California Government Code section 12940(a), harassment on

5    the basis of sex in violation of Government Code section 12940(j), the employer's failure

6    to take corrective action in violation of Government Code section 12940(k), and

7    intentional infliction of emotional distress. (*See* Ex. 4.) The case was removed to the

8    federal court for the Northern District of California on September 20, 2007.

9    7. On September 18, 2007, Defendant Medicis requested Plaintiff to proceed with the

10   arbitration of said controversy in the manner provided in the Agreement (*see* Ex. 5), but

11   Plaintiff refused. On September 27, 2007, Defendant offered to modify the arbitration

12   procedure to accommodate Plaintiff's potential concerns. (*See* Ex. 6.) Plaintiff continues

13   to refuse to arbitrate this dispute.

14   8. On or about October 22, 2007, Plaintiff resigned from her employment with Medicis.

15   WHEREFORE, this motion is made pursuant to Sections 4 of Title 9 of the United Stated

16   Code on the grounds that the parties hereto entered into agreements which provide for arbitration

17   of all of the claims and issues made subject to this lawsuit by Plaintiff's complaint filed herein.

18   Defendants have requested that Plaintiff dismiss or agree to stay this action and proceed to

19   arbitration of her individual claims under the procedures specified under the agreement, but

20   Plaintiff has refused. Defendants have no other adequate remedy but to compel arbitration and

21   stay these proceedings pending the outcome of arbitration.

22   WHEREFORE, this motion is based on this Notice, Motion, the attached Memorandum of

23   Points and Authorities and Declarations of Debi Heileman and Cristina Olivella, all pleadings,

24   records and files herein, and upon such other oral or documentary evidence as may be accepted at

3

1    the time of hearing.

2        WHEREFORE, Defendants pray for an order compelling arbitration of the controversy in

3    accordance with the Agreement and for such other and further relief as the Court deems proper.

4

5

6    Dated: January 21, 2008                    FOX ROTHSCHILD LLP

7

8                                              By:    /s/ David F. Faustman

9                                                   _____
                                                   DAVID F. FAUSTMAN
10                                                  Attorneys for Defendants
                                                   MEDICIS PHARMACEUTICAL
11                                                 CORPORATION and ROBERT NEVIN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WCI 21386v1 01/21/08

4

MOTION TO COMPEL ARBITRATION

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................... 1

II. STATEMENT OF FACTS ........................................................................................ 1

III. GOVERNING LAW ................................................................................................. 4

IV. THE COURT SHOULD ENFORCE THE PARTIES' AGREEMENT AND
COMPEL ARBITRATION. ...................................................................................... 6

    A.    A Valid Arbitration Agreement Was Formed Between The Parties. ................ 6

    B.    No Defense Exists To Deny Enforcement Of The Agreement. ........................ 7

        1. The Agreement is not procedurally unconscionable. ............................... 7

        2. The Agreement is not substantively unconscionable. ............................. 8

        3. The Court need not consider the *Armendariz* factors. ............................ 9

            a. Even applying *Armendariz*, the Arbitration Provision is
               enforceable. ....................................................................................... 9

            b. Any purported "unconscionable" provisions are severable. ............. 11

    C.    The Arbitration Provision Encompasses The Claims At Issue. ................... 11

V. THE COURT SHOULD STAY OR DISMISS THE PENDING LITIGATION. ............. 12

VI. CONCLUSION ...................................................................................................... 12

FOX ROTHSCHILD LLP
235 PINE STREET
SUITE 1500
SAN FRANCISCO, CA 94104

WC1 21386v1 01/21/08

1

## TABLE OF AUTHORITIES

2

### CASES

3
*A&M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473 .......................................7

4

*American Software, Inc. v. Ali* (1996) 46 Cal.App.4th 1386 .........................................8

5

*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83. ...........i, 7, 9, 10

6

*Buckeye Check Cashing, Inc. v. Cardengna*, 546 U.S. 440 (2006) ..................................5

7

*Caley v. Gulfstream Aero. Corp.*, 428 F.3d 1359 (11th Cir. 2005) ..................................6

8

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126 (9th Cir. 2000)..........................4, 5, 9

9

*Circuit City Stores, Inc. v. Adams*, 279 F.3d 889 (9th Cir. 2002).....................................11

10

*Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001) ...............................................4

11

*Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104 (9th Cir. 2002) ....................................7

12

*EEOC v. Waffle House, Inc.*, 534 U.S. 279 (2002) ........................................................5

13

*Fittante v. Palm Springs Motors* (2003) 105 Cal.App.4th 708........................................8

14

*Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840 (2nd Cir. 1987)...................................6

15

*Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991) ........................................8

16

*Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444 (2003).....................................9, 10

17

*Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002).....................................9, 10

18

*Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165 (9th Cir. 2003) ....................................7

19

*Kinney v. United Healthcare Servs., Inc.* (1999) 70 Cal.App.4th 1322......................7, 8

20

*Lucas v. Gund, Inc.*, 450 F. Supp. 2d 1125 (C.D. Cal. 2006) ..................................10, 11

21

*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995)................................4

22

*McManus v. CIBC World Markets Corp.* (2003) 109 Cal.App.4th 76 ...........................7, 10

23

*Medical Development Corp. v. Industrial Molding Corp.*, 479 F.2d 345 (10th Cir. 1973) ..................................................................................................................6

24

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983)............................4, 11

25

*Perry v. Thomas*, 482 U.S. 483 (1987) ........................................................................5

26

*Seawright v. American General Fin. Servs.*, 507 F.3d 967 (6th Cir. 2007)....................................6

27

*Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999).....................................4, 5, 12

28

ii

**FOX ROTHSCHILD LLP**
235 PINE STREET
SUITE 1500
SAN FRANCISCO, CA 94104

MOTION TO COMPEL ARBITRATION

WCI 21386v1 01/21/08

*Sparling v. Hoffman Constr. Co., Inc.*, 864 F.2d 635 (9th Cir. 1988) .......................................5, 12

*Tinder v. Pinkerton Sec.*, 305 F.3d 728 (7th Cir. 2002)......................................................................6

*Valero Refining, Inc. v. M/T Lauberhorn*, 813 F.2d 60 (5th Cir. 1987)..............................................6

*Washington Mutual Bank FA v. Superior Court* (2001) 24 Cal.4th 906.............................................5

## STATUTES

15 U.S.C. § 7001 ....................................................................................................................................6

28 U.S.C. § 1332.................................................................................................................................3, 1

9 U.S.C. § 2 ...........................................................................................................................................4

9 U.S.C. § 3 .........................................................................................................................................12

9 U.S.C. § 4 .........................................................................................................................................11

9 U.S.C. §§ 3-4............................................................................................................................passim

Cal. Civ. Code § 1633.7 ........................................................................................................................6

Cal. Code Civ. Proc. § 1281.4.............................................................................................................12

Government Code section 12940(a)......................................................................................................4

Government Code section 12940(j), ....................................................................................................4

Government Code section 12940(k), ....................................................................................................4

FOX ROTHSCHILD LLP
235 PINE STREET
SUITE 1500
SAN FRANCISCO, CA 94104

MOTION TO COMPEL ARBITRATION

WC1 21386v1 01/21/08

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.    INTRODUCTION**

3  Plaintiff Kimberlea McManigal initiated this lawsuit by filing a complaint (the

4  "Complaint") in the Superior Court of California, San Francisco County, seeking monetary

5  damages for alleged discrimination and harassment based on her sex by her employer, Defendant

6  Medicis Pharmaceutical Corporation, and her supervisor, Defendant Robert Nevin.  Pursuant to

7  section 1332 of Title 28 of the United States Code, Defendant Medicis removed this matter to

8  federal court.

9  Jurisdiction is proper here because this is a dispute between citizens of different states.

10  Defendant Medicis is a corporation incorporated in the State of Delaware with its principal place

11  of business in the State of Arizona.  Defendant Nevin is a citizen of the State of New York.

12  Plaintiff is a citizen of the State of California.  The amount in controversy exceeds $75,000.00.

13  Jurisdiction is, therefore, proper under 28 U.S.C. § 1332.

14  Defendants bring this motion to compel arbitration and to stay this litigation pending

15  arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3-4, because the parties

16  to the litigation mutually agreed to submit the disputes identified in the Complaint to arbitration

17  with the American Arbitration Association ("AAA").  The issues identified n the Complaint are

18  within the scope of the arbitration agreement and are thus subject to arbitration, not adjudication

19  by the courts.

20  Plaintiff will likely claim that the arbitration agreements are "unconscionable" under

21  California state law.  Such determinations should be made by the arbitrator, but in any event,

22  Defendants have already offered to cure whatever defects Plaintiff identifies.  For example,

23  Defendant has offered to bear the entire cost of the arbitration and conduct the arbitration in

24  California.

25  **II.    STATEMENT OF FACTS**

26  McManigal began her employment with Medicis on August 8, 2005.  On February 5,

27  2007, McManigal accepted an award of stock under the Medicis Stock Incentive Plan.  (Exhibit

28  ("Ex.") 2 to Declaration of Debi Heileman ("Heileman Decl.").)  The  agreement setting out the

FOX ROTHSCHILD LLP
235 PINE STREET
SUITE 1500
SAN FRANCISCO, CA 94104

WCI 21386v1 01/21/08

1

MOTION TO COMPEL ARBITRATION

terms of this award (the "Agreement") included a provision for mandatory arbitration (the "Arbitration Provision" or "the Provision"). (Ex. 1 to Heileman Decl., ¶ 11.) In consideration of the grant of restricted stock awarded, McManigal and Medicis "voluntarily promise[d] and agree[d] to arbitrate any and all claims and disputes covered by this Agreement." (Ex. 1 to Heileman Decl., ¶ 11.) The claims covered by the Agreement include, but are not limited to, claims arising under:

> "(1) any alleged or actual contract, agreement, or covenant (oral, written, or implied), including this Agreement . . . ;(2) any policy, compensation, or benefit plan of the Corporation, including the Plan . . . ;(3) all federal, state, or local laws, regulations, statutes, or policies prohibiting employment discrimination and/or harassment, (including, without limitation, discrimination or harassment based on race, sex, national origin, religion, age, or disability) and/or unlawful retaliation; (4) any public policy; (5) any and all claims for personal, emotional, physical, or economic injury; and (6) any other rights, obligations, or duties arising out of constitutions, statutes or common law, whether or not specifically referred to in this Agreement, and whether similar to or dissimilar to rights, obligations, or duties referred to in this Agreement . . . ." (Ex. 1 to Heileman Decl., ¶ 11(A).)

Further, the Arbitration Provision provides that the only claims not subject to arbitration under the agreement were limited to:

1.  "any claim by the Grantee for workers' compensation benefits;

2.  any claim by the Grantee for benefits under a benefit plan of the Corporation which provides its own arbitration procedure;

3.  any claim by a party involving violation of rules, regulations, or laws governing insider trading;

4.  any claim prohibited from binding arbitration by applicable laws or public policy; and

5.  any claim brought before the Equal Employment Opportunity Commission, however, notwithstanding the foregoing, the Grantee agrees that the Grantee's sole recovery for any damages shall be through the binding arbitration process described herein." (Ex. 1 to Heileman Decl., ¶ 11(B).)

The Agreement expressed that it included binding arbitration three times, at the beginning, middle and end of the contract, including the following statement in capital letters: "THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION. THE ARBITRATION

2

FOX ROTHSCHILD LLP
235 PINE STREET
SUITE 1500
SAN FRANCISCO, CA 94104

WCI 21386v1 01/21/08

1   PROVISION MAY BE ENFORCED BY THE CORPORATION AND BY THE GRANTEE."

2   (Ex. 1 to Heileman Decl.)  McManigal accepted the Agreement electronically.  (Ex. 2 to

3   Heileman Decl.; Heileman Decl. at ¶ 2.)  By accepting the grant, McManigal acknowledged that

4   she "read all the required documents and agreed to all terms and conditions," and "that [her]

5   acceptance or rejection of this award constitutes [her] electronic signature and will provide the

6   same authority as [her] formal written signature."  (Ex. 1 to Heileman Decl., p. 15)

7        Under the Agreement, the AAA's National Rules for the Resolution of Employment

8   Disputes apply:

9        "AAA's Employment Dispute Rules shall govern disputes concerning the
10       term or termination of [McManigal's] employment; all federal, state, or local
         laws, regulations, statutes, or policies prohibiting employment
11       discrimination and/or harassment (including, without limitation,
         discrimination or harassment based on race, sex, national origin, religion,
12       age, or disability) and/or unlawful retaliation in termination of employment
         in violation of any public policy; any policy, compensation, or benefit plan
13       of the Corporation, excluding the Plan; and claims for personal, emotional or
         physical injury not otherwise governed by Workers' Compensation."  (Ex. 1
14       to Heileman Decl., ¶ 11.)

15  Pursuant to the Agreement, the arbitral forum was to be "the sole, exclusive, and final remedy for

16  resolving any such claims and disputes."  (Ex. 1 to Heileman Decl., ¶ 11.)  McManigal and

17  Medicis agreed that the either party could "bring an action in a court of competent jurisdiction to

18  compel arbitration under this Agreement," but both promised not to "pursue a covered claim

19  against the other by action, method or legal proceeding other than arbitration" or else face

20  dismissal.  (Ex. 1 to Heileman Decl., ¶¶ 11(c)(11), 11(D)(3).)  The parties further agreed that any

21  arbitration governed by the Employment Dispute Rules would be conducted in Phoenix, Arizona,

22  and that the Agreement would be administered, interpreted and enforced under the internal laws

23  of the state of Delaware.  (Ex. 1 to Heileman Decl., ¶¶ 11(c)(7), 12(f).)

24       Plaintiff also accepted a Stock Option Agreement from Medicis.  (Heileman Decl. at ¶ 4.)

25  This Stock Option Agreement included a mandatory arbitration provision with terms nearly

26  identical to those of the Arbitration Provision in the Agreement.  (Ex. 3 to Heileman Decl.,

27  Article VI.)

28

1      Rather than pursue an arbitral remedy, however, on July 23, 2007, McManigal filed a

2 complaint for damages in the Superior Court of California, San Francisco County. (Ex. 4 to

3 Declaration of Cristina Olivella ("Olivella Decl.").) McManigal's suit alleges discrimination on

4 the basis of sex in violation of Government Code section 12940(a), harassment on the basis of sex

5 in violation of Government Code section 12940(j), the employer's failure to take corrective action

6 in violation of Government Code section 12940(k), and intentional infliction of emotional

7 distress.

8      On September 17, 2007, counsel for Medicis contacted McManigal's counsel requesting

9 that this matter be put to arbitration. (Ex. 5 to Olivella Decl.) Defendants also offered to modify

10 the arbitration procedure to accommodate any concerns of Plaintiff. (Ex. 6 to Olivella Decl.;

11 Olivella Decl. at ¶ 4.) Counsel for McManigal have declined to arbitrate this matter.

12      In the meantime, Plaintiff took an extended pregnancy leave, and then voluntarily

13 resigned from her employment with Medicis in October of 2007.

14 **III.**   **GOVERNING LAW**

15      Under the FAA, written agreements to arbitrate disputes arising out of transactions

16 involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such

17 grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA is

18 enforceable in both state and federal courts. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr.*

19 *Corp.*, 460 U.S. 1, 24 (1983). Although the parties to a contract may have included a choice-of-

20 law clause in an arbitration agreement, the federal law of arbitrability, not state decisional law,

21 governs with respect to the allocation of power between courts and arbitrators. *See Chiron Corp.*

22 *v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130-1131 (9th Cir. 2000) (citing *Mastrobuono v.*

23 *Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995)). The FAA embodies a clear federal

24 policy in favor of arbitration. *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999).

25 Arbitration clauses are specifically enforceable in the employment context. *Circuit City Stores,*

26 *Inc. v. Adams*, 532 U.S. 105 (2001).

27      In ruling on a petition to compel arbitration, the Court's inquiry is limited to determining:

28 (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement

4

FOX ROTHSCHILD LLP
235 PINE STREET
SUITE 1500
SAN FRANCISCO, CA 94104

WC1 21386v1 01/21/08

MOTION TO COMPEL ARBITRATION

1   encompasses the dispute at issue. *Chiron Corp.*, 207 F.3d at 1130. If the court finds that a valid

2   agreement exists that encompasses the dispute at issue, pursuant to the FAA, the court must

3   enforce the arbitration in accordance with its terms. *Simula,* 74 F.3d at 719. "The standard for

4   demonstrating arbitrability is not high." *Id.* Any doubts concerning the scope of arbitration is

5   usually resolved in favor of arbitration. *Chiron Corp.*, 207 F.3d at 1131. Any challenge to the

6   agreement, as a whole, is also properly submitted to arbitration. *Buckeye Check Cashing, Inc. v.*

7   *Cardengna*, 546 U.S. 440, 445-446 (2006) ("Unless the challenge is to the arbitration clause

8   itself, the issue of the contract's validity is considered by the arbitrator in the first instance.").

9        Federal law directs courts to place arbitration agreements on equal footing with other

10   contracts. *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 293 (2002). State law is applicable to

11   govern issues concerning the validity, revocability, and enforceability of contracts generally,

12   including those contracts with arbitration clauses. *Perry v. Thomas*, 482 U.S. 483, 492 n.9

13   (1987). In this case, the Agreement included a Delaware choice of law provision. In determining

14   whether to give effect to the contractual choice of law by the parties, this Court must apply

15   California choice of law rules. *Sparling v. Hoffman Constr. Co., Inc.*, 864 F.2d 635, 641 (9th Cir.

16   1988) (Federals court sitting in diversity apply the law of the forum state when making a choice

17   of law determination.). California will apply the law of contractual choice if: (1) the chosen state

18   has a substantial relationship to the parties or their transaction or (2) there is any other reasonable

19   basis for the parties' choice of law, unless the chosen state's law offends a "fundamental"

20   California policy. *Washington Mutual Bank FA v. Superior Court* (2001) 24 Cal.4th 906, 916-

21   917. Even where there is a "fundamental" conflict, the chosen state's law will apply unless

22   California has a materially greater interest than the chosen state in resolving the particular issue.

23   *Id.* There is a reasonable basis for the choice of law provision in the Agreement, as Defendant

24   Medicis is incorporated under the laws of Delaware. Assuming, however, that California has a

25   materially greater interest than Delaware in resolving the particular issue due to McManigal's

26   employment in the state, for the purposes of this motion, the Court may apply California law in

27   issues concerning the validity, revocability and enforceability of contracts.

28

FOX ROTHSCHILD LLP
235 PINE STREET
SUITE 1500
SAN FRANCISCO, CA 94104

WCI 21386v1 01/21/08

IV.   **THE COURT SHOULD ENFORCE THE PARTIES' AGREEMENT AND COMPEL ARBITRATION.**

A.    **A Valid Arbitration Agreement Was Formed Between The Parties.**

Medicis offered McManigal an award of restricted stock under the Medicis Pharmaceutical Corporation 2004 Stock Incentive Plan. (Ex. 1 to Heileman Decl.; Heileman Decl. at ¶ 2.) McManigal accepted the Agreement electronically through the Charles Schwab website. (Ex. 2 to Heileman Decl.; Heileman Decl. at ¶ 2.) The electronic Agreement specifically noted that her "electronic signature" would provide the same authority as her "formal written signature." (Ex. 1 to Heileman Decl., p. 15.) A contract or signature may not be denied legal effect, validity, or enforceability solely because of its electronic form. 15 U.S.C. § 7001; Cal. Civ. Code § 1633.7. Further, under the FAA, an arbitration agreement need not be signed to be enforceable. *See, e.g. Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2nd Cir. 1987) ("[W]hile the [FAA] requires a writing, it does not require that the writing be signed by the parties."); *Valero Refining, Inc. v. M/T Lauberhorn*, 813 F.2d 60, 64 (5th Cir. 1987) ("We note also that section three of the Act does not require that a charter party be signed in order to enforce an arbitration agreement contained within it."); *Seawright v. American General Fin. Servs.*, 507 F.3d 967, 978 (6th Cir. 2007) ("[U]nlike contracts that fall under the Statute of Frauds, arbitration agreements under the FAA need to be written, but not necessarily *signed*."); *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 736 (7th Cir. 2002) ("Although §3 of the FAA requires arbitration agreements to be written, it does not require them to be signed."); *Medical Development Corp. v. Industrial Molding Corp.*, 479 F.2d 345, 348 (10th Cir. 1973) ("It [is] not necessary that there be a simple integrated writing or that a party sign the writing containing the arbitration clause."); *Caley v. Gulfstream Aero. Corp.*, 428 F.3d 1359, 1369 (11th Cir. 2005) ("We readily conclude that no signature is needed to satisfy the FAA's written agreement requirement.").

In consideration of the terms and conditions set forth in the Agreement, including Medicis's grant of the restricted stock award to McManigal, both parties voluntarily promised and agreed to arbitrate any and all claims and disputes involving Plaintiff's employment. (Ex. 1 to Heileman Decl., ¶ 11.) This mutual promise has been held to be adequate consideration under

6

FOX ROTHSCHILD LLP
235 PINE STREET
SUITE 1500
SAN FRANCISCO, CA 94104

WCI 21386v1 01/21/08

1   both state and federal law. *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1108 (9th Cir. 2002)

2   (employer's promise to submit to arbitration and to forego the option of a judicial forum for a

3   specified class of claims constitutes sufficient consideration); *Armendariz v. Foundation Health*

4   *Psychare Services, Inc.* (2000) 24 Cal.4th 83, 120. McManigal accepted a similar agreement to

5   arbitrate employment claims in her Stock Option Agreement as well. (Heileman Decl. at ¶ 4; *See*

6   Ex. 3 to Heileman Decl., Article VI.) Thus, a valid agreement to arbitrate exists between the

7   parties.

8          **B.      No Defense Exists To Deny Enforcement Of The Agreement.**

9          California law, like federal law, considers arbitration agreements as "valid, irrevocable,

10   and enforceable, save upon such grounds as exist at law or in equity for the revocation of any

11   contract." *Armendariz*, 24 Cal.4th at 98. Defendants suspect that, notwithstanding the validity

12   and enforceability of the Arbitration Provision, McManigal will argue that it is unconscionable.

13   Unconscionability refers to "an absence of meaningful choice on the part of one of the parties

14   together with contract terms which are unreasonably favorable to the other party." *Ingle v.*

15   *Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (citing *A&M Produce Co. v. FMC*

16   *Corp.* (1982) 135 Cal.App.3d 473, 486). To be unenforceable, the party challenging the

17   arbitration agreement must show both procedural and substantive unconsionability. *Armendariz*,

18   24 Cal.4th at 114. "The more substantively oppressive the contract term, the less evidence of

19   procedural unconscionability is required to come to the conclusion that the term is unenforceable,

20   and vice versa." *Id.*

21          **1. The Agreement is not procedurally unconscionable.**

22          In considering procedural unconscionability, the court must examine the manner in which

23   the contract was negotiated and the circumstances of the parties at that time. *Kinney v. United*

24   *Healthcare Servs., Inc.* (1999) 70 Cal.App.4th 1322, 1329. Procedural unconscionability focuses

25   on whether there is "oppression" arising from an inequality of bargaining power or "surprise"

26   arising from buried terms in a complex printed form. *McManus v. CIBC World Markets Corp.*

27   (2003) 109 Cal.App.4th 76, 87. "Mere inequality in bargaining power ... is not a sufficient

28   reason to hold that arbitration agreements are never enforceable in the employment context... ."

FOX ROTHSCHILD LLP
235 PINE STREET
SUITE 1500
SAN FRANCISCO, CA 94104

WCI 21386v1 01/21/08

1  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991).

2      McManigal was not forced to accept the Arbitration Provision as a condition of her

3  employment with Medicis. This was not a contract of adhesion. The Agreement itself was

4  entirely optional. Additionally, there was no element of "surprise." Further, the Arbitration

5  Provision was conspicuously provided for in the Agreement, being referred to three times and in

6  all capital letters. (Ex. 1 to Heileman Decl.)

7                **2. The Agreement is not substantively unconscionable.**

8      To find the Arbitration Provision as a whole to be unconscionable, there must be a large

9  amount of substantive unconscionability. *Armendariz*, 24 Cal.4th at 114. Substantive

10 unconscionability focuses on whether the terms of the agreement are "so one-sided as to shock

11 the conscience." *Kinney*, 70 Cal.App.4th at 1330. Courts should not "change contractual terms

12 that the parties have agreed to merely because the court believes the terms are unreasonable."

13 *American Software, Inc. v. Ali* (1996) 46 Cal.App.4th 1386, 1391. At a minimum, a "modicum of

14 bilaterality" is necessary. *Id.* at 116-117. This exists when both the employer and employee are

15 bound to submit their claims to arbitration, subject to the same rules and procedures, and the same

16 advantages and disadvantages. *Fittante v. Palm Springs Motors* (2003) 105 Cal.App.4th 708,

17 725.

18      The Arbitration Provision provides for a mutual promise to arbitrate claims. (Ex. 1 to

19 Heileman Decl., ¶ 11.) The coverage of claims is expansive, and includes claims that an

20 employee would bring against an employer (e.g. discrimination), as well as claims that an

21 employer would realistically bring against an employee (e.g. breach of contract). The Provision

22 does not take away any of McManigal's rights, nor does it require her to waive any rights.

23 Furthermore, Medicis does not have the power to modify or terminate the Arbitration Provision

24 unilaterally. Any modification must be in writing signed by both parties. (Ex. 1 to Heileman

25 Decl., ¶ 11(D)(4).) Thus, the Arbitration Provision is not substantively unconscionable and

26 posseses the requisite "modicum of bilaterality" necessary to be enforceable.

27 //

28 //

FOX ROTHSCHILD LLP
235 PINE STREET
SUITE 1500
SAN FRANCISCO, CA 94104

WC1 21386v1 01/21/08

### 3. The Court need not consider the *Armendariz* factors.

Defendants expect that McManigal will also argue that the Arbitration Provision does not meet the elements of *Armendariz*, *supra*. This Court, however, need not determine whether the Provision meets those elements because the FAA governs the Arbitration Provision between the parties. As previously discussed, the Court may only consider (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. *Chiron Corp.*, *supra*, 207 F.3d at 1130. The requirements of *Armendariz* would require this court to entertain matters of arbitral procedure which are to be resolved first by the arbitrator, not the court. *See Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444, 452-453 (2003). An arbitrator should decide procedural issues relating to the arbitration because parties expect the arbitrator, not the court, to decide such disputes. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002). Notwithstanding the inapplicability of *Armendariz*, in order to facilitate an arbitration, Defendants represented to McManigal's counsel that they were willing to waive any parts of the Arbitration Provision that Plaintiff fees are inconsistent with the holding of *Armendariz*. (Ex. 3 to Olivella Decl.)

*Armendariz* holds that arbitration agreements must: (1) not restrict an employee's right to recovery substantive remedies afforded by statute; (2) entitle the parties to adequate discovery; (3) require a written findings by the arbitrator; (4) not require an employee to bear any type of expense that the employee would not be required to bear if he or she were free to bring the action in court; and (5) require a neutral arbitrator. These issues concern "neither the validity of the arbitration clause, nor its applicability to the underlying dispute between the parties." *See Bazzle*, *supra*, 539 U.S. at 452. Rather, these are issues of contract interpretation and arbitration procedures best suited for arbitrators to consider. *See id.* at 252-253.

#### a. Even applying *Armendariz*, the Arbitration Provision is enforceable.

The Arbitration Provision is not unconscionable under *Armendariz*. The Provision does not restrict remedies:

"The arbitrator shall issue such award as is proper under the applicable

1   substantive law of Arizona or of the United States, as the case may be, and
2   the evidence."

3   The Provision entitles the parties to adequate discovery:

4
5   "The AAA's Employment Dispute Rules shall govern disputes," and "Each
    party shall have the presumptive right to take two (2) depositions at their
6   own expense. The arbitrator may order additional depositions for good cause
    shown and such other discovery as the arbitrator considers necessary."

7   The Provision further requires written findings by a neutral arbitrator:
8
9   "The AAA shall appoint an arbitrator within thirty (30) days of the AAA's
    receipt of notice that the matter was not, or will not be, resolved through
10  mediation." . . . . "The arbitrator shall issue a written opinion setting forth a
    statement of the grounds for the award and the method of determining
11  damages, if any, awarded."

12      The fee-sharing part of the Arbitration Provision, that "[McManigal] shall pay an amount

13  equivalent to the filing fee in Arizona District Court, plus one-half of the expense of the

14  transcript, and any other amounts deemed fair and reasonable by the arbitrator" and that

15  "[Medicis] shall bear the remaining fees and expenses of the arbitration," may not meet the

16  *Armendariz* standard, but such a cost-sharing provision is not fatal to the Arbitration Provision

17  because it is not central to the Provision. *See, e.g., Lucas v. Gund, Inc.*, 450 F. Supp. 2d 1125,

18  1133 (C.D. Cal. 2006) ("The costs and fees provision . . . violates the fifth prong of *Armendariz*.

19  . . .Thus, the Court declines to enforce this particular provision."); *McManus v. CIBC World*

20  *Markets Corp.* (2003) 109 Cal.4th 76, 102 ("[T]he unconscionable provision requiring payment

21  of the fees can be severed from the arbitration agreements."). Medicis has offered to pay the full

22  cost of arbitration. The Court can simply sever the fee-sharing clause, and allow the remainder of

23  the Arbitration Provision to be enforced.

24      In sum, this Court should not apply the *Armendariz* factors to this Arbitration Provision

25  because those involve procedural matters more appropriate for an arbitrator to decide. *See*

26  *Bazzle*, 539 U.S. at 452-453; *Howsam*, 537 U.S. at 84. In the event that the Court chooses to

27  apply *Armendaiz*, however, the Arbitration Provision is still enforceable without the fee-sharing

28  element.

10

FOX ROTHSCHILD LLP
235 PINE STREET
SUITE 1500
SAN FRANCISCO, CA 94104

WC1 21386v1 01/21/08

1                                 **b. Any purported "unconscionable" provisions are severable.**

2          California law provides courts the discretion the sever an unconscionable provision.

3 *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 895 (9th Cir. 2002). In exercising this

4 discretion, courts look to whether the "central purpose of the contract is tainted with illegality" or

5 whether the "illegality is collateral to its main purpose." Id. at 895. "Unconscionable provisions

6 may be severed from the agreement, allowing the remainder of the agreement to be enforced, so

7 long as the entire agreement is not permeated with unconscionability." *Lucas, supra*, 450 F.

8 Supp. 2d at 1134.

9          In addition to the cost-sharing clause of the Arbitration Provision, Defendants expect

10 McManigal to assert that the Arbitration Provision is "unconscionable" because it provides that

11 the arbitration shall take place in Phoenix, Arizona. Defendant concedes that this provision

12 conflicts with FAA section 4, which provides that the arbitration shall take place "within the

13 district in which the petition for an order directing such arbitration is filed." 9 U.S.C. § 4.

14 Medicis has already offered to waive the venue part of the Provision. Taking the cost-sharing and

15 venue clauses together, however, does not mean that the Arbitration Provision as a whole is

16 unconscionable and thus unenforceable. In *Lucas, supra*, 450 F. Supp. 2d at 1134-1135, the court

17 granted the defendants' petition to compel arbitration on the condition that the provisions in the

18 arbitration agreement awarding arbitration costs and attorney's fees to the prevailing party and

19 requiring the arbitration to take place in New Jersey be excised from the agreement. Similarly,

20 the cost-sharing and venue clauses in this matter can be severed from the Arbitration Provision

21 without rendering the entire agreement unenforceable. The inclusion of such terms do not

22 "permeate" the Arbitration Provision with substantive unconsionability. Therefore, the

23 Arbitration Provision is otherwise enforceable.

24        **C.    The Arbitration Provision Encompasses The Claims At Issue.**

25          Questions of arbitrability are to be addressed with a "healthy regard for the federal policy

26 favoring arbitration," and "any doubts concerning the scope of arbitrable issues must be resolved

27 in favor of arbitration." *Moses H. Cone, supra,* 460 U.S. at 24-25. The Arbitration Provision

28 specifically states that claims relating to "employment discrimination" and "harassment," as well

11

1  as claims for "emotional injury" are subject to mandatory arbitration. (Ex. 1 to Heileman Decl., ¶

2  11(A).) Thus, the Arbitration Provision plainly covers the claims for harassment and

3  discrimination based on McManigal's sex, as well as the allegation of intentional infliction of

4  emotional distress complained of in the Complaint.

5          The Arbitration Provision at issue is a valid one, and it clearly encompasses

6  McManigal's claims. Thus, the Court must enforce the arbitration agreement pursuant to its

7  terms. *Simula, supra,* 175 F.3d at 719.

8  **V.      THE COURT SHOULD STAY OR DISMISS THE PENDING LITIGATION.**

9          Pursuant to the FAA, the Court must stay the trial of the action if it orders the matter to

10  arbitration. 9 U.S.C. § 3; Cal. Code Civ. Proc. § 1281.4. Additionally, the Ninth Circuit has held

11  that if all the claims involved in an action are arbitrable so as to bar all of the plaintiff's claims, a

12  court may dismiss the action instead of staying it. *See Sparling v. Hoffman Constr. Co.,* 864 F.2d

13  636, 638 (9th Cir. 1988). The Ninth Circuit has similarly affirmed district court decisions in

14  which an order compelling arbitration was accompanied by the dismissal of the action because all

15  of the plaintiff's claims were subject to arbitration. *See, e.g., Simula, supra,* 175 F.3d at 719.

16  These cases recognize that although the FAA requires the court to issue a stay of the action until

17  the arbitration is complete, the FAA does not purport to limit dismissal of a case when

18  appropriate.

19          As set forth above, the Arbitration Provision here is valid and enforceable. McManigal

20  has not raised any claims that would not be resolved through arbitration. Dismissal is warranted

21  because there is no purpose in the Court maintaining jurisdiction of this case. At the very least,

22  the Court should stay this action until arbitration is completed.

23  **VI.     CONCLUSION**

24          Defendants have offered to "cure" whatever "defects" or elements of "unconsionability"

25  Plaintiff may raise. Any defective clauses of the arbitration agreements can be easily severed.

26          Defendants respectfully request that McManigal's claims be dismissed without prejudice,

27  or in the alternative, that the Court enter an order staying the action ecause the claims asserted

28  against Defendants must be submitted to arbitration. Defendants further request that the Court

12

FOX ROTHSCHILD LLP
235 PINE STREET
SUITE 1500
SAN FRANCISCO, CA 94104

WCl 21386v1 01/21/08

1    enter an order compelling McManigal to submit her claims to binding arbitration pursuant to the

2    Agreement.

3

4    Dated: January 21, 2008            FOX ROTHSCHILD LLP

5

6                                      By:  /s/ David F. Faustman            .
                                            DAVID F. FAUSTMAN
7                                           Attorneys for Defendants
                                            MEDICIS PHARMACEUTICAL
8                                           CORPORATION and ROBERT NEVIN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOX ROTHSCHILD LLP
235 PINE STREET
SUITE 1500
SAN FRANCISCO, CA 94104

WC1 21386v1 01/21/08                MOTION TO COMPEL ARBITRATION

| TIME RECEIVED | REMOTE CSID | DURATION | PAGES | STATUS |
|---|---|---|---|---|
| January 18, 2008 2:56:31 PM GMT-07: | 6028080822 | 39 | 1 | Received |

01/18/2008  14:53    6028080822              MEDICIS                         PAGE  01/01

**DECLARATION**

I declare as follows:

1.    I am an employee of Medicis Pharmaceutical Corporation ("Medicis"). I submit this declaration in support of Defendants' Motion for Order Compelling Arbitration. I have personal knowledge of the facts following facts, and can competently testify thereto if called upon to do so.

2.    Medicis offered to grant an award of restricted stock under the Medicis 2004 Stock Incentive Plan ("Restricted Stock Agreement" or "Agreement") to Kimberlea McManigal through the company's Charles Schwab webpage. In consideration of the grant of stock award, the Restricted Stock Agreement included a provision for the mandatory arbitration of claims under the Agreement. The Schwab webpage allowed Ms. McManigal the opportunity to accept the Agreement electronically by clicking an "accept" button at the bottom of the webpage. Attached hereto as Exhibit 1 is a true and correct copy of the electronic form Restricted Stock Agreement (the "Agreement").

3.    On February 5, 2007, Ms. McManigal accepted the Agreement electronically through the Schwab webpage. Attached hereto as Exhibit 2 is a true and correct copy of a report from Charles Schwab showing the date and time that Ms. McManigal accepted the Agreement.

4.    Medicis also offered, and Ms. McManigal accepted, a Stock Option Agreement that included an agreement to arbitrate claims. Attached hereto as Exhibit 3 is a true and correct copy of the Stock Option Agreement.

I declare under penalty of perjury under the laws of the state of California, that the foregoing is true and correct. Executed this __18__ day of January 2008 in Scottsdale, Arizona.

_Debi Heil_

Debi Heileman, Stock Plan Administrator

MOTION TO COMPEL ARBITRATION

Error! Unknown document property name.

EXHIBIT 1

THIS AGREEMENT is made as of Feb 07, 2006 (the "*Date of Grant*") by and between MEDICIS PHARMACEUTICAL CORPORATION, a Delaware corporation (the "*Corporation*"), and KIMBERLEA A MCMANIGAL (the "*Grantee* ").

WHEREAS, the Grantee is a valuable and trusted employee of the Corporation and the Corporation considers it desirable and in its best interests to grant the Grantee an award of restricted Stock (the "*Restricted Stock*") under the Medicis Pharmaceutical Corporation 2004 Stock Incentive Plan (the "*Plan*");

WHEREAS, Section 7 of the Plan states that Restricted Stock granted under the Plan shall be evidenced by an agreement incorporating such terms and conditions as the Committee in its absolute discretion deems desirable and consistent with the terms of the Plan;

WHEREAS, the Committee took action on the Date of Grant to authorize the issuance of the Restricted Stock to the Grantee; and

WHEREAS, the Grantee and the Corporation, together, consider it desirable and in their best interests to voluntarily promise and agree to submit to binding arbitration any and all claims covered by this Agreement, and to agree that binding arbitration pursuant to this Agreement shall be the sole, exclusive, and final remedy for resolving any such claims and disputes;

NOW, THEREFORE , in consideration of the premises and mutual covenants herein contained, it is agreed by and between the parties as follows:

1. GRANT OF RESTRICTED STOCK. Pursuant to Section 9 of the Plan, and subject to the terms and conditions set forth herein and in the Plan, the Corporation hereby grants to the Grantee, in the aggregate 150 shares of Restricted Stock, which shall be subject to the restrictions and conditions set forth in this Agreement.

2. RESTRICTIONS. Except as otherwise provided in this Agreement, the restrictions on the Restricted Stock are that the Stock will be forfeited by the Grantee and all of the Grantee's rights to such Stock shall immediately terminate without any payment or consideration by the Corporation, in the event of any sale, assignment, transfer, hypothecation, pledge or other alienation of such Restricted Stock made or attempted, whether voluntary or involuntary, and if involuntary whether by process of law in any civil or criminal suit, action or proceeding, whether in the nature of an insolvency or bankruptcy proceeding or otherwise, without the written consent of the Board of Directors of the Corporation (the "*Board*"), excluding the Grantee if he so serves on the Board (the "*Restrictions*").

3. VESTING. Except as otherwise provided herein or in the Plan, the Restrictions applicable to the Restricted Stock shall lapse (i.e., the Restricted Stock shall "vest") as to: (a) 10% of the shares of Restricted Stock on the first anniversary of the Date of Grant, (b) 10% of the shares of Restricted Stock on the second anniversary of the Date of Grant, (c) 20% of the shares of Restricted Stock on the third anniversary of the Date of Grant, (d) 30% of the shares of Restricted Stock on the fourth anniversary of the Date of Grant, and (e) 30% of the shares of Restricted Stock on the fifth anniversary of the Date of Grant (each such date, a "*Vesting Date*"). In no event shall Grantee vest in any additional shares of Restricted Stock following the termination of Grantee's Continuous Service. All remaining unvested shares of Restricted Stock shall automatically be forfeited upon Grantee's cessation of Continuous Service.

4. CHANGE OF CONTROL. In the event of a Change of Control (as defined below), the Restrictions shall lapse with respect to 100% of the Restricted Stock. For purposes hereof,

"Change of Control" means:

a. the acquisition, other than from the Corporation, by any individual, entity or group (within the meaning of Section 13(d) or 14(d)(2) of the Securities Exchange Act of 1934, as amended from time to time) (the *"Exchange Act"*), of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 25% or more of either (i) the then outstanding shares of Stock (the *"Outstanding Company Stock"*) or (ii) the combined voting power of the then outstanding voting securities of the Corporation entitled to vote generally in the election of directors (the *"Company Voting Securities"*), provided, however, that any acquisition by (x) the Corporation or any of its subsidiaries, or any employee benefit plan (or related trust) sponsored or maintained by the Corporation or any of its subsidiaries or (y) any corporation with respect to which, following such acquisition, more than 50% of, respectively, the then outstanding shares of common stock of such corporation and the combined voting power of the then outstanding voting securities of such corporation entitled to vote generally in the election of directors is then beneficially owned, directly or indirectly, by all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Stock and Company Voting Securities immediately prior to such acquisition in substantially the same portion as their ownership, immediately prior to such acquisition of the Outstanding Company Stock and Company Voting Securities, as the case may be, shall not constitute a Change of Control of the Corporation; or

b. individuals who, as of the Effective Date, constitute the Board (the **"Incumbent Board "**) cease for any reason to constitute at least a majority of the Board, provided that any individual becoming a director subsequent to the Effective Date, whose election or nomination for election by the Corporation's shareholders was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual whose initial assumption of office is in connection with an actual or threatened election contest relating to the election of the Directors of the Corporation (as such terms are used in Rule 14a-11 of Regulation 14A promulgated under the Exchange Act); or

c. consummation of a reorganization, merger or consolidation (a **"Business Combination "**), in each case, with respect to which all or substantially all of the individuals and entities who were the respective beneficial owners of the Outstanding Company Stock and Company Voting Securities immediately prior to such Business Combination do not, following such Business Combination, beneficially own, directly or indirectly, more than 50% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination in substantially the same proportion as their ownership immediately prior to such Business Combination or the Outstanding Company Stock and Company Voting Securities, as the case may be; or

d. (i) a complete liquidation or dissolution of the Corporation or (ii) a sale or other disposition of all or substantially all of the assets of the Corporation other than to a corporation with respect to which, following such sale or disposition, more than 50% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors is then owned beneficially, directly or indirectly, by all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Stock and Company Voting Securities immediately prior to such sale or disposition in substantially the same proportion as their ownership of the Outstanding Company Stock and Company Voting Securities, as the case may be, immediately prior to such sale or disposition.

5. **CERTIFICATES.** Certificates representing the shares of Restricted Stock shall be issued and held by the Corporation in escrow until (i) their delivery to Grantee or Grantee's estate as set forth herein, subject to the delivery by Grantee or Grantee's estate of any documents which the Committee in its discretion may require as a condition to the issuance and delivery of shares or (ii) their forfeiture and transfer to the Corporation. Certificates representing shares of Restricted Stock in respect of which the restrictions have lapsed shall be delivered to Grantee or Grantee's estate as soon as practicable following each Vesting Date (less any shares used to satisfy the Corporation's withholding obligations, if applicable), provided that all applicable withholding requirements have been met. Any certificates issued in respect of shares of Restricted Stock, at the sole discretion of the Committee, shall bear an appropriate legend referring to the terms, conditions, and restrictions applicable to such Award, substantially in the following form:

> "THE TRANSFERABILITY OF THIS CERTIFICATE AND THE COMMON STOCK
>
> REPRESENTED HEREBY ARE SUBJECT TO THE TERMS AND CONDITIONS
>
> (INCLUDING FORFEITURE) CONTAINED IN THE RESTRICTED STOCK AWARD
>
> AGREEMENT DATED AS OF [_____ ___], 2006, ENTERED INTO BETWEEN THE
>
> REGISTERED OWNER AND MEDICIS PHARMACEUTICAL CORPORATION."

At the expiration of the Restrictions, the Corporation shall redeliver to the Grantee (or his legal representative, beneficiary or heir) share certificates for the Stock deposited with it without any legend except as otherwise provided by the Plan, this Agreement or applicable law. During the period that the Corporation holds the shares of Restricted Stock in escrow, the Grantee shall have the right to receive dividends on and to vote the Restricted Stock while it is subject to restriction, except as otherwise provided by the Plan. If the Award is forfeited in whole or in part, the Grantee will assign, transfer, and deliver any evidence of the shares of Restricted Stock to the Corporation and cooperate with the Corporation to reflect such forfeiture. By accepting the Award, the Grantee acknowledges that the Corporation does not have an adequate remedy in damages for the breach by the Grantee of the conditions and covenants set forth in this Agreement and agrees that the Corporation is entitled to and may obtain an order or a decree of specific performance against the Grantee issued by any court having jurisdiction.

6. **ADJUSTMENT.** The Award may be adjusted as provided in the Plan including, without limitation, Section 11 of the Plan.

7. **NONTRANSFERABILITY; BENEFICIARIES.** This Award shall not be assignable or transferable by the Grantee, otherwise than by will or the laws of descent and distribution or pursuant to a beneficiary designation.

8. **REPRESENTATIONS AND WARRANTIES OF THE GRANTEE.**

a. Upon receipt of the shares of Stock of the Corporation as a result of the lapse of the Restrictions of the Restricted Stock, the Grantee, if so requested by the Corporation, shall represent and warrant to the Corporation that the Grantee is acquiring the shares of Stock for investment and not with a view toward resale or distribution to the public and, if so requested by the Corporation, shall deliver to the Corporation a written statement to that effect satisfactory to the Corporation. Additionally, if so requested by the Corporation, the Grantee shall execute and deliver to the Corporation a written agreement that the Grantee will not sell or offer to sell any such shares of Stock unless a registration statement shall be in effect with respect to such shares of Stock under the Securities Act and any applicable state securities law or unless the Grantee shall have furnished to the Corporation an opinion, in form and substance satisfactory to the Corporation, of legal counsel acceptable to the

Corporation, that such registration is not required. Furthermore, the Corporation shall have the right to require the Grantee to enter into such stockholder or other related agreements as the Corporation deems necessary or appropriate under the circumstances as a condition to the issuance of any shares of Stock under this Award.

b. The Grantee acknowledges that there may be adverse tax consequences upon the vesting of the Restricted Stock or disposition of the shares of Stock once vested, and that the Grantee should consult a tax advisor prior to such time.

c. The issuance and transfer of shares of Stock shall be subject to compliance by the Corporation and the Grantee with all applicable requirements of securities laws and with all applicable requirements of any stock exchange on which the Stock may be listed at the time of such issuance or transfer. The Grantee understands that the Corporation is under no obligation to register or qualify the Stock with the Securities and Exchange Commission ("**SEC**"), any state securities commissions or any stock exchange to effect such compliance.

## 9. PAYMENT OF WITHHOLDING TAX.

a. Subject to clause 9(b), upon the vesting of the Grantee's Award, the Grantee shall be required to pay to the Corporation (in cash or cash equivalent) the amount of any federal, state or local taxes of any kind which the Corporation shall be required to withhold with respect thereto. In the event that either (i) Grantee fails to notify the Corporation at least five business days prior to any Vesting Date that Grantee intends to pay to the Corporation the amount of any federal, state or local taxes of any kind which the Corporation shall be required to withhold with respect to the shares of Restricted Stock vesting on such Vesting Date or (ii) Grantee fails to provide timely payment (in cash or cash equivalent) of all sums required by the Corporation pursuant to this Section 9(a), the Corporation shall have the right and option, but not the obligation, to treat such failure as an election by Grantee to provide all or any portion of such required payment by means of tendering vested shares of Restricted Stock having a Fair Market Value equal to the amount of the tax withholding obligation, as determined by the Corporation; provided, however, that in no event shall Grantee be deemed to be tendering a number of shares of Restricted Stock having a value exceeding the minimum amount of tax required to be withheld by law.

b. If the Grantee properly elects, within thirty (30) days of the Date of Grant, to include in gross income for federal income tax purposes an amount equal to the Fair Market Value as of the Date of Grant of the shares of Restricted Stock granted hereunder pursuant to Section 83(b) of the Code (a "**Section 83(b) Election**"), the Grantee shall pay to the Corporation in the year of such grant, any federal, state or local taxes required to be withheld with respect to such shares. If the Grantee fails to make such payments, the Corporation shall, to the extent permitted by law, have the right to deduct from any payment of any kind otherwise due to the Grantee any federal, state or local taxes of any kind required by law to be withheld with respect to such shares of Stock. The Grantee agrees to provide a copy of such election to the Corporation within ten (10) days after filing the election with the Internal Revenue Service. Exhibit A contains a suggested form of Section 83(b) Election.

## 10. FORFEITURE FOR FRAUD, DISHONESTY, UNLAWFUL COMPETITION AND OTHER HARMFUL ACTS.

A. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT AND IN ADDITION TO THE RESTRICTIONS CONTAINED IN SECTION 2 OF THIS AGREEMENT, ALL UNVESTED RESTRICTED STOCK SHALL BE IMMEDIATELY FORFEITED IF: (i) THE COMMITTEE DETERMINES THAT THE GRANTEE ENGAGED IN ILLEGAL ACTS,

FRAUD, DISHONESTY, WILLFUL MISCONDUCT OR OTHER INTENTIONAL CONDUCT DETRIMENTAL TO THE CORPORATION, INCLUDING VIOLATION OF THE CORPORATION'S INSIDER TRADING POLICY (EACH AN *"IMPROPER ACT"*); (ii) THE GRANTEE'S EMPLOYMENT BY THE CORPORATION IS TERMINATED FOR CAUSE AND THE GRANTEE HAS COMMITTED IMPROPER ACTS; (iii) THE GRANTEE HAS AT ANY TIME DISCLOSED TO ANY PERSON, FIRM, CORPORATION OR OTHER ENTITY ANY OF THE CORPORATION'S PROPRIETARY INFORMATION (AS DEFINED BELOW) WITHOUT THE EXPRESS WRITTEN CONSENT OF THE BOARD, OR EXCEPT AS SUCH DISCLOSURE MAY HAVE BEEN REQUIRED IN CONNECTION WITH THE GRANTEE'S SERVICE AS AN EMPLOYEE OF THE CORPORATION OR BY LAW; (iv) THE GRANTEE SOLICITS OR OTHERWISE INDUCES ANY EMPLOYEE OF THE CORPORATION TO TERMINATE HIS EMPLOYMENT; (v) THE GRANTEE SOLICITS BUSINESS FROM ANY OF THE CORPORATION'S CUSTOMERS WITH WHOM THE GRANTEE HAS A RELATIONSHIP OR THE IDENTITY OF WHOM BECAME KNOWN TO THE GRANTEE BY REASON OF THE GRANTEE'S RELATIONSHIP WITH THE CORPORATION, FOR AND ON BEHALF OF ANY OF THE CORPORATION'S COMPETITORS; (vi) THE GRANTEE DISPARAGES THE CORPORATION OR COMMITS ANY OTHER ACT OF DISLOYALTY; (vii) THE GRANTEE ENGAGES IN ANY CONDUCT IN VIOLATION OF THE GRANTEE'S CONTRACTUAL OBLIGATIONS TO THE CORPORATION, INCLUDING BUT NOT LIMITED TO A VIOLATION OF ANY VALID NON- COMPETITION, NON-DISCLOSURE, NON-SOLICITATION OR OTHER AGREEMENT; (viii) THE GRANTEE FAILS TO ASSIGN TO THE CORPORATION ANY PATENT, COPYRIGHT, TRADEMARK OR OTHER INTELLECTUAL PROPERTY RIGHT IN VIOLATION OF ANY OF THE CORPORATION'S POLICIES OR ANY AGREEMENT BETWEEN THE CORPORATION AND THE GRANTEE; OR (ix) THE GRANTEE REFUSES TO BE AVAILABLE FOR REASONABLE CONSULTATION WITH RESPECT TO THE SUBJECT MATTER OF THE GRANTEE'S EMPLOYMENT OR ENGAGEMENT FOLLOWING TERMINATION OF SUCH EMPLOYMENT. THE ACTS OR CIRCUMSTANCES DESCRIBED IN THE PRECEDING SENTENCE SHALL BE REFERRED TO AS *"EVENTS OF FORFEITURE"*.

B. FOR PURPOSES OF THIS SECTION, THE TERM *"PROPRIETARY INFORMATION"* SHALL MEAN ALL CONFIDENTIAL OR SECRET CUSTOMER LISTS, PROSPECTIVE CUSTOMER LISTS, TRADE SECRETS, PROCESSES, PRODUCT FORMULATIONS, INVENTIONS, IMPROVEMENTS, MANUFACTURING FORMULATION OR SYSTEMS TECHNIQUES, PRODUCT FORMULAS, DEVELOPMENT OR EXPERIMENTAL WORK, WORKS IN PROCESS, BUSINESS, MARKETING AND COMPETITIVE STRATEGIES, INFORMATION RELATING TO ANY PATENT, TRADEMARK OR OTHER INTELLECTUAL PROPERTY RIGHT OF THE CORPORATION, AND ANY OTHER SECRET OR CONFIDENTIAL PROPRIETARY MATTER RELATING TO OR PERTAINING TO THE CORPORATION OR ITS PRODUCTS, SERVICES, SALES OR BUSINESS.

C. IN ADDITION TO THE FOREGOING RIGHTS AND ANY AND ALL OTHER RIGHTS WHICH THE CORPORATION (OR ANY OF ITS SUBSIDIARIES OR AFFILIATES) MAY HAVE AGAINST THE GRANTEE AT LAW OR IN EQUITY, THE GRANTEE FURTHER AGREES THAT UPON THE OCCURRENCE OF ANY OF THE EVENTS OF FORFEITURE DESCRIBED IN SUBSECTION A, UPON THE DETERMINATION OF THE COMMITTEE, THE GRANTEE SHALL OWE THE CORPORATION THE FAIR MARKET VALUE OF THE RESTRICTED STOCK (MEASURED AS OF THE DATE THE RESTRICTIONS THEREON LAPSED) OF ALL SHARES VESTED WITHIN THE THREE (3) YEARS PRECEDING THE COMMITTEE'S DETERMINATION THAT AN EVENT OF FORFEITURE HAS OCCURRED. THE GRANTEE SHALL PAY SUCH AMOUNT TO THE CORPORATION WITHIN THIRTY (30) DAYS OF THE COMMITTEE'S WRITTEN DETERMINATION THAT AN EVENT OF FORFEITURE HAS OCCURRED, WHICH DETERMINATION MAY BE MADE BY NOTICE TO THE GRANTEE WITHIN ANY TIME UP TO TWO (2) YEARS FOLLOWING THE GRANTEE'S TERMINATION OF CONTINUOUS SERVICE.

D. BY ACCEPTING THIS AGREEMENT, THE GRANTEE CONSENTS TO DEDUCTION FROM ANY AMOUNTS THE CORPORATION MAY OWE TO THE GRANTEE FROM TIME TO TIME (INCLUDING AMOUNTS OWED TO THE GRANTEE AS WAGES OR OTHER COMPENSATION, FRINGE BENEFITS, VACATION PAY OR COMMISSIONS) TO THE EXTENT OF ANY AMOUNT WHICH THE GRANTEE OWES THE CORPORATION PURSUANT TO THE PROVISIONS OF SUBSECTION C. WHETHER OR NOT THE CORPORATION ELECTS TO MAKE ANY SET-OFF IN WHOLE OR IN PART, IF THE CORPORATION DOES NOT RECOVER BY MEANS OF THE SET- OFF THE FULL AMOUNT OWED TO IT BY THE GRANTEE, THEN THE GRANTEE AGREES TO PAY IMMEDIATELY THE UNPAID BALANCE TO THE CORPORATION.

E. THE GRANTEE MAY BE RELEASED FROM THE GRANTEE'S OBLIGATIONS UNDER THIS SECTION 10 ONLY IF THE COMMITTEE DETERMINES, IN ITS SOLE DISCRETION, THAT SUCH A RELEASE IS IN THE BEST INTERESTS OF THE CORPORATION. SO LONG AS THEY ARE MADE IN GOOD FAITH, ALL DETERMINATIONS BY THE COMMITTEE MADE PURSUANT TO THIS SECTION 10 SHALL BE FINAL, BINDING AND NON-APPEALABLE.

11. **MANDATORY ARBITRATION.** In consideration of the terms and conditions set forth herein, including the Corporation's grant to the Grantee of the Award described above, the Grantee and the Corporation voluntarily promise and agree to arbitrate any and all claims and disputes covered by this Agreement. The arbitration shall be binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") and the National Rules for the Resolution of Employment Disputes (**"Employment Dispute Rules"**) in effect on the date the arbitration is commenced in accordance with this Agreement. The AAA's Employment Dispute Rules shall govern disputes concerning the term or termination of the Grantee's employment; all federal, state, or local laws, regulations, statutes, or policies prohibiting employment discrimination and/or harassment (including, without limitation, discrimination or harassment based on race, sex, national origin, religion, age, or disability) and/or unlawful retaliation in termination of employment in violation of any public policy; any policy, compensation, or benefit plan of the Corporation, excluding the Plan; and claims for personal, emotional or physical injury not otherwise governed by Workers' Compensation. The Commercial Arbitration Rules of the AAA shall govern all other disputes covered by this Agreement, including, without limitation, disputes relating to the Plan. The provisions of this Agreement shall govern the rights of all parties hereto, including but not limited to any party claiming for or on behalf of the Grantee, including the Grantee's heirs, successors, assigns, personal representatives and bankruptcy trustees. The Grantee and the Corporation further agree that binding arbitration pursuant to this Agreement shall be the sole, exclusive, and final remedy for resolving any such claims and disputes.

A. **CLAIMS COVERED BY MANDATORY ARBITRATION AGREEMENT.** With the exception of only those claims specifically excluded in paragraph B, below, this Agreement includes all legally actionable claims that the Grantee may currently, or in the future, have against the Corporation, including without limitation, claims arising under:

1. any alleged or actual contract, agreement, or covenant (oral, written, or implied), including this Agreement, between the Grantee and the Corporation relating to the Grantee's employment, the termination of the Grantee's employment, directorship and/or consultancy or an Award provided to the Grantee;

2. any policy, compensation, or benefit plan of the Corporation, including the Plan, unless the decision at issue was made by an entity other than the Corporation, in which case the agreement that arbitration is the exclusive remedy applies only to the Grantee's claims against the Corporation;

3. all federal, state, or local laws, regulations, statutes, or policies prohibiting employment discrimination and/or harassment, (including, without limitation, discrimination or harassment based on race, sex, national origin, religion, age, or disability) and/or unlawful retaliation;

4. any public policy;

5. any and all claims for personal, emotional, physical, or economic injury;

6. any other rights, obligations, or duties arising out of constitutions, statutes or common law, whether or not specifically referred to in this Agreement, and whether similar to or dissimilar to rights, obligations, or duties referred to in this Agreement, which are or may be granted to any party to this Agreement by the laws of any state or country in which either party resides or engages in the business of the Corporation.

B. **CLAIMS EXCLUDED FROM ARBITRATION AGREEMENT.** The only claims not subject to Arbitration under this Agreement are limited to:

1. any claim by the Grantee for workers' compensation benefits;

2. any claim by the Grantee for benefits under a benefit plan of the Corporation which provides its own arbitration procedure;

3. any claim by a party involving violation of rules, regulations, or laws governing insider trading;

4. any claim prohibited from binding arbitration by applicable laws or public policy; and

5. any claim brought before the Equal Employment Opportunity Commission, however, notwithstanding the foregoing, the Grantee agrees that the Grantee's sole recovery for any damages shall be through the binding arbitration process described herein.

C. **PROCEDURES.**

1. A written request for mediation/arbitration which contains a specific statement of the acts complained of and the statutory or other violation alleged, must be served by mail on the other party, and in duplicate (with a copy of this Agreement attached) on the AAA Office in Phoenix, Arizona or the AAA regional office in which Phoenix is located. The Corporation shall be served at its principal place of business, and the Grantee shall be served at the last home address shown in his/her personnel file. The request shall set forth the names, addresses, and telephone numbers of the parties; the amount in controversy, if any; the remedy sought; and that the hearing location agreed upon is Phoenix, Arizona. The request must be filed within the time limit established by the applicable statute of limitations necessary to perfect an administrative claim or initiate a lawsuit, whichever is sooner, if the dispute involves statutory rights, and when statutory rights are not at issue, within one year of the day on which the act complained of occurred, or notice thereof was given, whichever occurs first.

2. The parties shall attempt in good faith to select one person by agreement to mediate the dispute. The mediator, after consultation with the parties, will determine

the mediation procedures to be followed. The fees and expenses of the mediator, if any, will be paid by the Corporation. If no mutual agreement can be reached as to such person, then the dispute will be settled by binding arbitration under the procedures set forth below. No mediation shall exceed two hours without the Corporation's written agreement to lengthen the mediation. Mediation is not binding on either party.

3. If the dispute is not resolved by discussion or mediation within thirty (30) days of the request for mediation/arbitration, the AAA shall administer the arbitration. The AAA shall appoint an arbitrator within thirty (30) days of the AAA's receipt of notice that the matter was not, or will not be, resolved through mediation. The arbitrator must be licensed to practice law in the state in which the arbitration is convened, and the arbitrator shall, by virtue of background and similar experience, be knowledgeable in matters pertaining to restricted stock award agreements and employment relationships and disputes.

4. The arbitrator may establish rules for the conduct of the arbitration consistent with the terms of this agreement and the applicable AAA rules. Each party shall have the presumptive right to take two (2) depositions at their own expense. The arbitrator may order additional depositions for good cause shown and such other discovery as the arbitrator considers necessary. Each party shall be entitled to counsel of its choice. All proceedings shall be deemed private and confidential and shall not be disclosed to the public by either the arbitrator or the parties to the arbitration, except as required by legal process or as necessary to judicially challenge an arbitration award under the grounds set forth below. The arbitrator shall have the authority to entertain motions to dismiss and/or motions for summary judgment by any party and shall apply the standards governing such motions under the Federal Rules of Civil Procedure.

5. In arbitrations governed by the Commercial Arbitration Rules of the AAA, not earlier than thirty (30) nor more than forty-five (45) days after appointment, the arbitrator shall conduct a preliminary hearing in accordance with the AAA "Guidelines for Expediting Large, Complex Commercial Arbitrations." Not less than five (5) days prior to the preliminary hearing, all parties to the arbitration shall serve upon all other parties to the arbitration a written list of witnesses and exhibits to be used in the arbitration hearing. Except for good cause shown, no witness or exhibit may be utilized at the arbitration hearing other than those set forth on such list. The arbitrator shall have the power to compel production of documents at the hearing by subpoena. Each party shall be entitled to counsel of its choice. All proceedings and information provided at the hearings shall be deemed private and confidential and shall not be disclosed to the public by either the arbitrator or the parties to the arbitration. The arbitrator shall have the authority to entertain motions to dismiss and/or motions for summary judgment by any party and shall apply the standards governing such motions under the Federal Rules of Civil Procedure.

6. Also in arbitrations governed by the Commercial Arbitration Rules, the arbitrator shall receive evidence in a single hearing which shall be conducted in Phoenix, Arizona. The hearing shall commence not more than sixty (60) days after the appointment of the arbitrator.

7. In arbitrations governed by the Employment Dispute Rules, the arbitrator shall conduct an Arbitration Management Conference with the parties not later than sixty (60) days after appointment, and shall thereafter conduct the Arbitration in Phoenix, Arizona at a time and date set after consultation with the parties during the Management Conference.

8. The arbitrator shall issue such award as is proper under the applicable substantive law of Arizona or of the United States, as the case may be, and the evidence. The arbitrator shall have no power or authority to add to or, except as otherwise provided in Section D.4 hereof, to detract from the Agreement of the parties. The arbitrator shall not have authority to alter the terms or conditions of employment lawfully established by the Corporation, nor modify or disregard the standards of professional conduct and performance set by the Corporation in good faith, but shall only determine whether the law has been violated by the acts of either party as specifically alleged.

9. The arbitrator shall issue a final award not more than twenty (20) days following the conclusion of the hearing. The arbitrator shall have authority to grant injunctive relief in a form substantially similar to that which would otherwise be granted by a court of law. The arbitrator shall issue a written opinion setting forth a statement of the grounds for the award and the method of determining damages, if any, awarded. The award shall be final and binding on all parties and may be entered as a judgment, under seal, and enforced, or injunctive relief maybe sought, in any court of competent jurisdiction. Judicial modification of the award shall be limited to situations in which the arbitrator fails or refuses to apply controlling law or the valid and enforceable terms of this Agreement.

10.The arbitrator shall be entitled to receive reasonable compensation at an hourly rate to be established by agreement between the arbitrator and the AAA. All fees and expenses of the arbitration, including a transcript if either party requests, will be borne by the parties equally, except that in arbitrations governed by the Employment Dispute Rules, the fees and expenses will be borne by the parties as follows: The Grantee shall pay an amount equivalent to the filing fee in Arizona District Court, plus one-half of the expense of the transcript, and any other amounts deemed fair and reasonable by the arbitrator; the Corporation shall bear the remaining fees and expenses of the arbitration. Each party will pay for the fees and expenses of its own attorneys, experts, witnesses and the presentation of proof and post- hearings briefs, unless the party prevails on a claim for which attorneys' fees are recoverable by statute or contract, and the arbitrator awards such fees.

11.Either party may bring an action in a court of competent jurisdiction to compel arbitration under this Agreement, to seek to vacate an arbitration award, and to enforce an arbitration award. Except as otherwise provided in this Agreement, the Grantee agrees that the Grantee will not initiate or prosecute any lawsuit in any way related to any claim covered by this Agreement.

D. **MISCELLANEOUS PROVISIONS.** For the purposes of the arbitration provisions of this Agreement:

1. Notice will be effective on the fifth (5th) day after deposit with the United States Postal Service by certified mail, return receipt requested, properly addressed and with first class postage paid.

2. The term "Corporation" includes all related entities, all directors, officers, employees, agents, representatives, benefit plans, benefit plan sponsors, fiduciaries, administrators, or affiliates of any of the above, and all successors and assigns of any of the above excluding the Grantee.

3. If either party pursues a covered claim against the other by action, method or legal proceeding other than arbitration as provided herein, the responding party shall be

entitled to dismissal or injunctive relief regarding such action and shall be entitled to recover all costs, losses, and attorneys' fees related to such other action or proceeding.

4. This is the complete agreement of the parties on the subject of arbitration of disputes covered by this Agreement. This Agreement supersedes any prior or contemporaneous oral, written or implied understanding on the subject, shall survive the termination of the Grantee's employment, and can only be revoked or modified by a writing signed by the parties which specifically states an intent to revoke or modify this Agreement. If any provision, or term in a provision, of this Agreement is adjudged to be void or otherwise unenforceable in whole or in part, such adjudication shall not affect the validity of the remainder of the Agreement. To the extent that any provision of this Agreement is held invalid or unenforceable because it is overbroad, that provision shall not be void but shall be limited only to the extent required by applicable law and enforced as so limited.

5. This Agreement is not, and shall not be construed to create, any contract of employment, express or implied, nor does this Agreement in any way alter the "at will" status of the Grantee's employment.

## 12. MISCELLANEOUS.

a. This Award shall be subject in all respects to the terms of the Plan which shall be incorporated herein by reference, and the Award shall be interpreted in accordance with the Plan. The Committee shall interpret and construe the Plan and this Agreement, and its interpretations and determinations shall be conclusive and binding on the parties hereto and any other person claiming an interest hereunder, with respect to any issue arising hereunder or thereunder. In the event of a conflict or inconsistency between the terms and provisions of the Plan and the provisions of this Agreement, the Plan shall govern and control. All capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

b. The masculine pronoun shall be deemed to include the feminine, and the singular number shall be deemed to include the plural unless a different meaning is plainly required by the context.

c. Every provision of this Agreement is intended to be severable, and any illegal or invalid term shall not affect the validity or legality of the remaining terms.

d. This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original, but all such counterparts shall together constitute the same instrument.

e. The Grantee acknowledges that the Grantee is, and at all times will be, an employee-at-will of the Corporation, and nothing contained herein shall be construed to alter or affect the Grantee's at-will employment status. The Grantee acknowledges that the Grantee's at- will status can be modified only by a written contract which (a) sets forth an express restriction on the Grantee's at-will status; (b) is signed by both the Grantee and the President of the Corporation; and (c) expresses the specific intent that it is a contract of employment intended to modify the Grantee's at-will status. The Grantee's Continuous Service is terminable by the Corporation or by the Grantee, with or without cause, and with or without notice, at any time. In the event of the termination of the Grantee's Continuous Service, the Corporation shall have no liability to the Grantee, other than to pay the Grantee the compensation due through the Grantee's last day of employment or other service, and such termination shall not diminish or affect the enforceability of this Agreement.

f. This Agreement shall be administered, interpreted and enforced under the internal laws of the state of Delaware, without giving effect to the conflicts of law principles thereof. Any arbitration, application for injunctive relief, or litigation relating to the Agreement shall be filed and conducted in Maricopa County, Arizona.

g. The Corporation's failure to enforce at any time any provision of this Agreement or to require at any time performance by the Grantee of any of the provisions hereof shall in no way be construed to be a waiver of such provisions or to affect either the validity of this Agreement, or any part hereof, or the right of the Corporation thereafter to enforce each and every provision in accordance with the terms of this Agreement.

UPON ENTERING INTO THIS AGREEMENT, THE GRANTEE WARRANTS THAT HE HAS CAREFULLY READ THIS AGREEMENT, UNDERSTANDS ITS TERMS, AND HAS VOLUNTARILY AGREED TO ENTER INTO IT WITHOUT RELIANCE ON ANY REPRESENTATIONS OR PROMISES BY THE CORPORATION OTHER THAN AS SET FORTH IN THIS AGREEMENT.

THE GRANTEE HAS HAD SUFFICIENT OPPORTUNITY BEFORE SIGNING THE AGREEMENT TO ASK ANY QUESTIONS THE GRANTEE HAS ABOUT THE AGREEMENT AND HAS RECEIVED SATISFACTORY ANSWERS TO ALL SUCH QUESTIONS.

THE GRANTEE UNDERSTANDS THE GRANTEE'S RIGHTS AND OBLIGATIONS UNDER THIS AGREEMENT AND VOLUNTARILY ENTERS INTO IT.

THE GRANTEE ACKNOWLEDGES THE GRANTEE'S "AT-WILL" EMPLOYMENT STATUS.

THE GRANTEE RECOGNIZES THE GRANTEE'S WAIVER OF RIGHT TO A JURY TRIAL BY AGREEING TO MANDATORY ARBITRATION.

THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION. THE ARBITRATION PROVISION MAY BE ENFORCED BY THE CORPORATION AND BY THE GRANTEE.

**IN WITNESS WHEREOF** , the parties hereto have caused this Agreement to be executed on the day and year first above written.

**MEDICIS PHARMACEUTICAL CORPORATION**

By:    /s/ Jonah Shacknai

**GRANTEE**

By:

**MEDICIS PHARMACEUTICAL CORPORATION**
**2004 STOCK INCENTIVE PLAN**

**Exhibit A**

**Section 83(b) Election Form**

Attached is an Internal Revenue Code Section 83(b) Election Form. **IF YOU WISH TO MAKE A SECTION 83(B) ELECTION, YOU MUST DO SO WITHIN 30 DAYS AFTER THE DATE THE SHARES OF RESTRICTED STOCK COVERED BY THE ELECTION WERE TRANSFERRED TO YOU.** In order to make the election, you must completely fill out the attached form and file one copy with the Internal Revenue Service office where you file your tax return. In addition, one copy of the statement also must be submitted with your income tax return for the taxable year in which you make this election. Finally, you also must submit a copy of the election form to the Corporation within 10 days after filing that election with the Internal Revenue Service. A Section 83(b) election normally cannot be revoked.

## MEDICIS PHARMACEUTICAL CORPORATION
## 2004 STOCK INCENTIVE PLAN

### Election to Include Value of Restricted Stock in Gross Income in Year of Transfer Under Internal Revenue Code Section 83 (b)

Pursuant to Section 83(b) of the Internal Revenue Code, I hereby elect within 30 days after receiving the property described herein to be taxed immediately on its value specified in item 5 below.

1. The name, address and taxpayer identification number of the undersigned taxpayer are:

_____

_____

_____

S.S.N. or
T.I.N.:        _____

The name, address and taxpayer identification number of the taxpayer's spouse are (complete if applicable):

_____

_____

_____

S.S.N. or
T.I.N.:        _____

2. Description of the property with respect to which I am making this election:

_____ shares of common stock of Medicis Pharmaceutical Corporation (the "**Restricted Stock** ").

3. The shares of Restricted Stock were transferred to me on _____ ___, 200__.

4. This election relates to the 200__ calendar taxable year.

5. The shares of Restricted Stock are subject to the following restrictions:

The shares of Restricted Stock may not be transferred and are subject to forfeiture in the event of my termination of employment with Medicis Pharmaceutical Corporation and its subsidiaries (the "**Restrictions** "). The Restrictions will lapse in a series of annual installments over a five (5)-year period ending on _____, 20___.

6. Fair market value:

The fair market value at the time of transfer (determined without regard to any restrictions other than restrictions which by their terms will never lapse) of the shares of Restricted Stock with respect to which I am making this election is $_____ per share.

7. Amount paid for Restricted Stock:

The amount I paid for the Restricted Stock is $_____ per share.

8. Furnishing statement to employer:

A copy of this statement has been furnished to my employer, Medicis Pharmaceutical Corporation. If the transferor of the Restricted Stock is not my employer, that entity also has been furnished with a copy of this statement.

Dated: _____     Taxpayer
                               Signature     _____

The undersigned spouse of taxpayer joins in this election. (Complete if applicable).

Dated: _____     Spouse
                               Signature     _____

By accepting this grant, I acknowledge that I have read all the required documents and agree to all terms and conditions. I acknowledge that my acceptance or rejection of this award constitutes my electronic signature and will provide the same authority as my formal written signature.

☒ ☒

EXHIBIT 2

# Grant Acceptance Report

**Medicis Pharmaceutical Corp.**

Create Date:09/17/2007 11:50

**Selection Criteria**

First Name :
Last Name : mcmanigal
Employee ID :
SSN :
Grant Date From : Grant Date To :
Grant # :
Expiration Date From : Expiration Date To :
Acceptance Status Date From : Acceptance Status Date To :
Acceptance Status :
Participant Type : ALL
Access Country : ALL
Access Group : ALL

| Last Name | First Name | Employee ID | Employee Type | Grant ID | Grant Date | Expiration Date | Unvested Qty | Exercisable | Grant Acceptance Status | Grant Acceptance Status Date |
|-----------|-----------|-------------|---------------|----------|-----------|-----------------|--------------|-------------|-------------------------|------------------------------|
| MCMANIGAL | KIMBERLEA A | 114727064 | Neither | 015253 | 02/07/2006 | 02/07/2013 | 135 | 0 | Accepted | 02/05/2007 |

EXHIBIT 3

# MEDICIS 2006 INCENTIVE AWARD PLAN

## STOCK OPTION GRANT NOTICE

Medicis Pharmaceutical Corporation, a Delaware corporation (the "**Company**"), pursuant to the its 2006 Incentive Award Plan attached hereto as <u>Exhibit C</u> (the "**Plan**"), hereby grants to the individual listed below (the "**Participant**"), an option to purchase the number of shares of the Company's Class A common stock, par value $0.014 per share ("**Stock**"), set forth below (the "**Option**"). This Option is subject to all of the terms and conditions set forth herein and in the Stock Option Agreement attached hereto as <u>Exhibit A</u> (the "**Stock Option Agreement**") and the Plan, each of which are incorporated herein by reference. Unless otherwise defined herein or the Stock Option Agreement, the terms defined in the Plan shall have the same defined meanings in this Stock Option Grant Notice (the "**Grant Notice**").

**Participant:** _____

**Grant Date:** _____

**Exercise Price per Share:** $ _____

**Total Number of Shares Subject to the Option:** _____

**Expiration Date:** _____

**Type of Option:** ☐ Incentive Stock Option     ☐ Non-Qualified Stock Option

**Vesting Schedule:** Subject to the terms and conditions of the Plan, this Grant Notice and the Stock Option Agreement, this Option shall vest and become exercisable as to:

    (i)    10% of the total number of shares of Stock subject to the Option on _____, 20__,

    (ii)    10% of the total number of shares of Stock subject to the Option on _____, 20__,

    (iii)    20% of the total number of shares of Stock subject to the Option on _____, 20__,

    (iv)    30% of the total number of shares of Stock subject to the Option on _____, 20__, and

    (v)    30% of the total number of shares of Stock subject to the Option on _____, 20__.

In no event, however, shall this Option vest and become exercisable for any additional shares of Stock following the Participant's Termination of Employment, Termination of Consultancy, or Termination of Directorship, as applicable.

[Remainder of page intentionally left blank.]

By his or her signature below, the Participant agrees to be bound by the terms and conditions of this Grant Notice, the Stock Option Agreement and the Plan. The Participant has reviewed this Grant Notice, the Stock Option Agreement and the Plan in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Grant Notice and fully understands all provisions of this Grant Notice, the Stock Option Agreement and the Plan. The Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under or relating to this Grant Notice, the Stock Option Agreement and the Plan.

**MEDICIS PHARMACEUTICAL CORPORATION:**                                              **PARTICIPANT:**

By: _____                    By: _____

Print Name: _____                    Print Name: _____

Title: _____

Address:     8125 North Hayden Road                Address: _____

             Scottsdale, Arizona 85258-2463                 _____


Attachments:  Stock Option Agreement (**Exhibit A**)
              Form of Exercise Notice (**Exhibit B**)
              Medicis 2006 Incentive Award Plan (**Exhibit C**)
              Medicis 2006 Incentive Award Plan Prospectus (**Exhibit D**)

## EXHIBIT A

## TO STOCK OPTION GRANT NOTICE

## STOCK OPTION AGREEMENT

Pursuant to the Stock Option Grant Notice (the "*Grant Notice*") to which this Stock Option Agreement (this "*Agreement*") is attached, Medicis Pharmaceutical Corporation, a Delaware corporation (the "*Company*"), has granted to the Participant an option under the Medicis 2006 Incentive Award Plan (the "*Plan*") to purchase the number of shares of the Company's Class A common stock, par value $0.014 per share ("*Stock*"), indicated in the Grant Notice.

## ARTICLE I

## GENERAL

1.1     Defined Terms.  Wherever the following terms are used in this Agreement they shall have the meanings specified below, unless the context clearly indicates otherwise.  Capitalized terms not specifically defined herein shall have the meanings specified in the Grant Notice or, if not defined therein, the Plan.

"*Misconduct*" shall mean (i) the commission of any act of fraud, embezzlement or dishonesty by Participant that adversely affects the Company or any Subsidiary, (ii) any unauthorized use or disclosure by Participant of confidential information or trade secrets of the Company or any Subsidiary that adversely affects the Company or any Subsidiary, (iii) any willful and continued failure by Participant to substantially perform his or her duties with the Company or any Subsidiary (other than any such failure resulting from Participant's incapacity due to physical or mental illness), after a written demand for substantial performance is delivered to Participant by the Board, which demand specifically identifies the manner in which the Board believes that Participant has not substantially performed such duties, or (iv) any willful and continued failure by Participant to substantially follow and comply with the specific and lawful directives of the Board, as reasonably determined by the Board (other than any such failure resulting from Participant's incapacity due to physical or mental illness), after a written demand for substantial performance is delivered to Participant by the Board, which demand specifically identifies the manner in which the Board believes that Participant has not substantially performed such directives. The foregoing definition shall not in any way preclude or restrict the right of the Company (or any Subsidiary) to discharge or dismiss Participant or any other person in the service of the Company (or any Subsidiary) for any other acts or omissions, but such other acts or omissions shall not be deemed, for purposes of this Agreement, to constitute grounds for termination for Misconduct.

1.2     Incorporation of Terms of Plan.  The Option is subject to the terms and conditions of the Plan, which are incorporated herein by reference.

## ARTICLE II

## GRANT OF OPTION

2.1     Grant of Option.  In consideration of the Participant's past and/or continued employment with or service to the Company or a Parent or Subsidiary and for other good and valuable consideration, effective as of the Grant Date set forth in the Grant Notice (the "*Grant Date*"), the Company irrevocably grants to the Participant the Option to purchase any part or all of an aggregate of the number of shares of Stock set forth in the Grant Notice, upon the terms and conditions set forth in the Plan and this

Agreement. If the Option is designated as an Incentive Stock Option in the Grant Notice, the Option shall be an Incentive Stock Option to the maximum extent permitted by law.

2.2    Exercise Price. The exercise price of the shares of Stock subject to the Option shall be as set forth in the Grant Notice, without commission or other charge; *provided, however,* that the exercise price per share of Stock subject to the Option shall not be less than 100% of the Fair Market Value of a share of Stock on the Grant Date. Notwithstanding the foregoing, if this Option is designated as an Incentive Stock Option and the Participant owns (within the meaning of Section 424(d) of the Code) more than 10% of the total combined voting power of all classes of stock of the Company or any "subsidiary corporation" of the Company or any "parent corporation" of the Company (each within the meaning of Section 424 of the Code), the exercise price per share of Stock subject to the Option shall not be less than 110% of the Fair Market Value of a share of Stock on the Grant Date.

2.3    Consideration to the Company; No Employment Rights. In consideration of the grant of the Option by the Company, the Participant agrees to render faithful and efficient services to the Company or any Parent or Subsidiary. Nothing in the Plan or this Agreement shall confer upon the Participant any right to continue in the employ or service of the Company or any Parent or Subsidiary or shall interfere with or restrict in any way the rights of the Company and its Parents and Subsidiaries, which rights are hereby expressly reserved, to discharge or terminate the employment or services of the Participant at any time for no reason or for any reason whatsoever, with or without cause, except to the extent expressly provided otherwise in a written agreement between the Company, a Parent or a Subsidiary and the Participant.

## ARTICLE III

## PERIOD OF EXERCISABILITY

3.1    Commencement of Exercisability.

(a)    Subject to Sections 3.2, 3.3, and 7.9, the Option shall become vested and exercisable in such number of shares of Stock and at such times as are set forth in the Grant Notice.

(b)    No portion of the Option which has not become vested and exercisable at the date of the Participant's Termination of Employment, Termination of Directorship or Termination of Consultancy, as applicable, shall thereafter become vested and exercisable, except as may be otherwise provided by the Administrator or as set forth in a written agreement between the Company and the Participant.

3.2    Duration of Exercisability. The installments provided for in the vesting schedule set forth in the Grant Notice are cumulative. Each such installment which becomes vested and exercisable pursuant to the vesting schedule set forth in the Grant Notice shall remain vested and exercisable until it becomes unexercisable under Section 3.3.

3.3    Expiration of Option. Subject to earlier termination pursuant to Section 5.1, the Option may not be exercised to any extent by anyone after the first to occur of the following events:

(a)    The expiration of ten years from the Grant Date;

(b)    If this Option is designated as an Incentive Stock Option and the Participant owned (within the meaning of Section 424(d) of the Code), on the Grant Date, more than 10% of the total combined voting power of all classes of stock of the Company or any "subsidiary corporation" of the

A-2

Company or any "parent corporation" of the Company (each within the meaning of Section 424 of the Code), the expiration of five years from the Grant Date;

       (c)    The expiration of 90 days following the date of the Participant's Termination of Employment, Termination of Directorship or Termination of Consultancy, as applicable, unless such Termination of Employment, Termination of Directorship or Termination of Consultancy occurs by reason of the Participant's death or Disability or the discharge of the Participant for Misconduct;

       (d)    The expiration of twelve months following the date of the Participant's Termination of Employment, Termination of Directorship or Termination of Consultancy, as applicable, by reason of the Participant's Disability;

       (e)    The expiration of 180 days from the date of the Participant's Termination of Employment, Termination of Directorship or Termination of Consultancy, as applicable, by reason of the Participant's death; or

       (f)    The date of the Participant's Termination of Employment, Termination of Directorship or Termination of Consultancy, as applicable, by the Company or any Parent or Subsidiary by reason of the discharge of the Participant for Misconduct.

    3.4    <u>Special Tax Consequences</u>.  In the event the Option is designated an Incentive Stock Option, the Participant acknowledges that, to the extent that the aggregate Fair Market Value (determined as of the Grant Date) of all shares of stock with respect to which incentive stock options granted by the Company (or any "subsidiary corporation" or any "parent corporation" of the Company), including the Option, are exercisable for the first time by the Participant in any calendar year exceeds $100,000, the Option and such other options shall be non-qualified stock options to the extent necessary to comply with the limitations imposed by Section 422(d) of the Code. The Participant further acknowledges that the rule set forth in the preceding sentence shall be applied by taking the Option and other "incentive stock options" into account in the order in which they were granted, as determined under Section 422(d) of the Code and the Treasury Regulations thereunder.

**ARTICLE IV**

**EXERCISE OF OPTION**

    4.1    <u>Person Eligible to Exercise</u>.  Except as provided in Section 7.2, during the lifetime of the Participant, only the Participant may exercise the Option or any portion thereof.  After the death of the Participant, any exercisable portion of the Option may, prior to the time when the Option becomes unexercisable under Section 3.3, be exercised by the Participant's personal representative or by any person empowered to do so under the deceased the Participant's will or under then applicable laws of descent and distribution.

    4.2    <u>Partial Exercise</u>.  Any exercisable portion of the Option or the entire Option, if then wholly exercisable, may be exercised in whole or in part at any time prior to the time when the Option or portion thereof becomes unexercisable under Section 3.3.

    4.3    <u>Manner of Exercise</u>.  The Option, or any exercisable portion thereof, may be exercised solely by delivery to the Secretary of the Company or the Secretary's office of all of the following prior to the time when the Option or such portion thereof becomes unexercisable under Section 3.3:

A-3

(a)      An Exercise Notice in writing signed by the Participant or any other person then entitled to exercise the Option or portion thereof, stating that the Option or portion thereof is thereby exercised, such notice complying with all applicable rules established by the Administrator.  Such notice shall be substantially in the form attached as Exhibit B to the Grant Notice (or such other form as is prescribed by the Administrator, which may include, without limitation, electronic notice provided through a third-party administrator);

(b)      The receipt by the Company of full payment for the shares of Stock with respect to which the Option or portion thereof is exercised, including payment of any applicable withholding tax, which may be in one or more of the forms of consideration permitted under Section 4.4; and

(c)      In the event the Option or portion thereof shall be exercised pursuant to Section 4.1 by any person or persons other than the Participant, appropriate proof of the right of such person or persons to exercise the Option.

4.4      Method of Payment.  Payment of the exercise price shall be by any of the following, or a combination thereof, at the election of the Participant:

(a)      cash;

(b)      check;

(c)      to the extent permitted under applicable laws, delivery of a notice that the Participant has placed a market sell order with a broker with respect to shares of Stock then issuable upon exercise of the Option, and that the broker has been directed to pay a sufficient portion of the net proceeds of the sale to the Company in satisfaction of the aggregate exercise price; *provided*, that payment of such proceeds is then made to the Company upon settlement of such sale;

(d)      with the consent of the Administrator, through the delivery of shares of Stock which have been owned by the Participant for at least six months, duly endorsed for transfer to the Company with a Fair Market Value on the date of exercise equal to the aggregate exercise price of the Option or exercised portion thereof; or

(e)      any combination of the consideration provided in the foregoing.

4.5      Conditions to Issuance of Stock Certificates.  The shares of Stock deliverable upon the exercise of the Option, or any portion thereof, may be either previously authorized but unissued shares or issued shares which have then been reacquired by the Company.  Such shares shall be fully paid and nonassessable.  The Company shall not be required to issue or deliver any shares of Stock purchased upon the exercise of the Option or portion thereof prior to fulfillment of all of the following conditions:

(a)      The admission of such shares to listing on all stock exchanges on which such Stock is then listed;

(b)      The completion of any registration or other qualification of such shares under any state or federal law or under rulings or regulations of the Securities and Exchange Commission or of any other governmental regulatory body, which the Administrator shall, in its absolute discretion, deem necessary or advisable;

A-4

(c)     The obtaining of any approval or other clearance from any state or federal governmental agency which the Administrator shall, in its absolute discretion, determine to be necessary or advisable;

(d)     The receipt by the Company (or the Parent or Subsidiary employing the Participant) of full payment for such shares, including payment of any applicable withholding tax, which may be in one or more of the forms of consideration permitted under Section 4.4; and

(e)     The lapse of such reasonable period of time following the exercise of the Option as the Administrator may from time to time establish for reasons of administrative convenience.

4.6     Rights as Stockholder. The Participant (or other person entitled to exercise the Option) shall not be, nor have any of the rights or privileges of, a stockholder of the Company in respect of any shares of Stock purchasable upon the exercise of any part of the Option unless and until such shares shall have been issued by the Company to the Participant (or such other person) (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company). No adjustment will be made for a dividend or other right for which the record date is prior to the date the shares of Stock are issued, except as provided in Section 11.3 of the Plan.

## ARTICLE V

## FORFEITURE FOR FRAUD,
## DISHONESTY, UNLAWFUL COMPETITION
## AND OTHER HARMFUL ACTS

5.1     NOTWITHSTANDING ANYTHING TO THE CONTRARY IN SECTION 3.3 OR IN ANY EXHIBIT TO THIS AGREEMENT, THE PARTICIPANT'S RIGHTS WITH RESPECT TO THE PORTION OF THE OPTION GRANTED HEREUNDER BUT NOT YET EXERCISED SHALL IMMEDIATELY TERMINATE AND BE NULL AND VOID IF:

(a)     THE ADMINISTRATOR DETERMINES THAT THE PARTICIPANT ENGAGED IN ILLEGAL ACTS, FRAUD, DISHONESTY, WILLFUL MISCONDUCT OR OTHER INTENTIONAL CONDUCT DETRIMENTAL TO THE COMPANY OR ANY SUBSIDIARY, INCLUDING VIOLATION OF THE INSIDER TRADING POLICY OF THE COMPANY OR ANY SUBSIDIARY (EACH AN "*IMPROPER ACT*");

(b)     THE PARTICIPANT'S EMPLOYMENT BY THE COMPANY OR ANY SUBSIDIARY IS TERMINATED FOR CAUSE AND THE PARTICIPANT HAS COMMITTED IMPROPER ACTS;

(c)     THE PARTICIPANT HAS AT ANY TIME DISCLOSED TO ANY PERSON, FIRM, CORPORATION OR OTHER ENTITY ANY "*PROPRIETARY INFORMATION*" (AS DEFINED BELOW) OF THE COMPANY OR ANY SUBSIDIARY WITHOUT THE EXPRESS WRITTEN CONSENT OF THE BOARD, OR EXCEPT AS SUCH DISCLOSURE MAY HAVE BEEN REQUIRED IN CONNECTION WITH THE PARTICIPANT'S SERVICE AS AN EMPLOYEE OF THE COMPANY OR ANY SUBSIDIARY OR AS OTHERWISE REQUIRED BY LAW;

(d)     THE PARTICIPANT SOLICITS OR OTHERWISE INDUCES ANY EMPLOYEE OF THE COMPANY OR ANY SUBSIDIARY TO TERMINATE HIS EMPLOYMENT;

(e)    THE PARTICIPANT SOLICITS BUSINESS FROM ANY OF THE COMPANY'S OR ANY SUBSIDIARY'S CUSTOMERS WITH WHOM THE PARTICIPANT HAS A RELATIONSHIP OR THE IDENTITY OF WHOM BECAME KNOWN TO THE PARTICIPANT BY REASON OF THE PARTICIPANT'S RELATIONSHIP WITH THE COMPANY OR ANY SUBSIDIARY, FOR AND ON BEHALF OF ANY OF THE COMPANY'S COMPETITORS;

(f)    THE PARTICIPANT DISPARAGES THE COMPANY OR ANY SUBSIDIARY OR COMMITS ANY OTHER ACT OF DISLOYALTY;

(g)    THE PARTICIPANT ENGAGES IN ANY CONDUCT IN VIOLATION OF THE PARTICIPANT'S CONTRACTUAL OBLIGATIONS TO THE COMPANY OR ANY SUBSIDIARY, INCLUDING BUT NOT LIMITED TO A VIOLATION OF ANY VALID NON-COMPETITION, NON-DISCLOSURE, NON-SOLICITATION OR OTHER AGREEMENT;

(h)    THE PARTICIPANT FAILS TO ASSIGN TO THE COMPANY OR ANY SUBSIDIARY ANY PATENT, COPYRIGHT, TRADEMARK OR OTHER INTELLECTUAL PROPERTY RIGHT IN VIOLATION OF ANY OF THE POLICIES OF THE COMPANY OR ANY SUBSIDIARY OR ANY AGREEMENT BETWEEN THE PARTICIPANT AND THE COMPANY OR ANY SUBSIDIARY; OR

(i)    THE PARTICIPANT REFUSES TO BE AVAILABLE FOR REASONABLE CONSULTATION WITH RESPECT TO THE SUBJECT MATTER OF THE PARTICIPANT'S EMPLOYMENT OR ENGAGEMENT FOLLOWING TERMINATION OF SUCH EMPLOYMENT.

THE ACTS OR CIRCUMSTANCES DESCRIBED IN THIS SECTION 5.1 SHALL BE REFERRED TO AS *"EVENTS OF FORFEITURE"*.

5.2    FOR PURPOSES OF THIS ARTICLE V, THE TERM *"PROPRIETARY INFORMATION"* SHALL MEAN ALL CONFIDENTIAL OR SECRET CUSTOMER LISTS, PROSPECTIVE CUSTOMER LISTS, TRADE SECRETS, PROCESSES, PRODUCT FORMULATIONS, INVENTIONS, IMPROVEMENTS, MANUFACTURING FORMULATION OR SYSTEMS TECHNIQUES, PRODUCT FORMULAS, DEVELOPMENT OR EXPERIMENTAL WORK, WORKS IN PROCESS, BUSINESS, MARKETING AND COMPETITIVE STRATEGIES, INFORMATION RELATING TO ANY PATENT, TRADEMARK OR OTHER INTELLECTUAL PROPERTY RIGHT OF THE COMPANY OR ANY SUBSIDIARY, AND ANY OTHER SECRET OR CONFIDENTIAL PROPRIETARY MATTER RELATING TO OR PERTAINING TO THE PRODUCTS, SERVICES, SALES OR BUSINESS OF THE COMPANY OR ANY SUBSIDIARY.

5.3    IN ADDITION TO THE FOREGOING RIGHTS AND ANY AND ALL OTHER RIGHTS WHICH THE COMPANY (OR ANY OF ITS SUBSIDIARIES OR AFFILIATES) MAY HAVE AGAINST THE PARTICIPANT AT LAW OR IN EQUITY, THE PARTICIPANT FURTHER AGREES THAT UPON THE OCCURRENCE OF ANY OF THE EVENTS OF FORFEITURE DESCRIBED IN SECTION 5.1, UPON THE DETERMINATION OF THE ADMINISTRATOR, THE PARTICIPANT SHALL OWE THE COMPANY THE EXCESS OF THE FAIR MARKET VALUE OVER THE EXERCISE PRICE (MEASURED AS OF THE DATE OF EXERCISE) OF ALL SHARES ACQUIRED THROUGH EXERCISE OF ANY OPTION WITHIN THE THREE YEARS PRECEDING THE ADMINISTRATOR'S DETERMINATION THAT AN EVENT OF FORFEITURE HAS OCCURRED. THE PARTICIPANT SHALL PAY SUCH AMOUNT TO THE COMPANY WITHIN 30 DAYS OF THE ADMINISTRATOR'S WRITTEN DETERMINATION THAT AN EVENT OF FORFEITURE HAS OCCURRED, WHICH DETERMINATION MAY BE MADE BY NOTICE TO THE PARTICIPANT WITHIN ANY TIME UP TO TWO YEARS FOLLOWING THE

A-6

PARTICIPANT'S TERMINATION OF EMPLOYMENT, TERMINATION OF DIRECTORSHIP OR TERMINATION OF CONSULTANCY, AS APPLICABLE.

5.4   BY ACCEPTING THIS AGREEMENT, THE PARTICIPANT CONSENTS TO DEDUCTION FROM ANY AMOUNTS THE COMPANY MAY OWE TO THE PARTICIPANT FROM TIME TO TIME (INCLUDING AMOUNTS OWED TO THE PARTICIPANT AS WAGES OR OTHER COMPENSATION, FRINGE BENEFITS, VACATION PAY OR COMMISSIONS) TO THE EXTENT OF ANY AMOUNT WHICH THE PARTICIPANT OWES THE COMPANY PURSUANT TO THE PROVISIONS OF SECTION 5.3. WHETHER OR NOT THE COMPANY ELECTS TO MAKE ANY SET-OFF IN WHOLE OR IN PART, IF THE COMPANY DOES NOT RECOVER BY MEANS OF THE SET-OFF THE FULL AMOUNT OWED TO IT BY THE PARTICIPANT, THEN THE PARTICIPANT AGREES TO PAY IMMEDIATELY THE UNPAID BALANCE TO THE COMPANY.

5.5   THE PARTICIPANT MAY BE RELEASED FROM THE PARTICIPANT'S OBLIGATIONS UNDER THIS ARTICLE V ONLY IF THE ADMINISTRATOR DETERMINES, IN ITS SOLE DISCRETION, THAT SUCH A RELEASE IS IN THE BEST INTERESTS OF THE COMPANY. SO LONG AS THEY ARE MADE IN GOOD FAITH, ALL DETERMINATIONS BY THE ADMINISTRATOR MADE PURSUANT TO THIS ARTICLE V SHALL BE FINAL, BINDING AND NON-APPEALABLE.

## ARTICLE VI

## MANDATORY ARBITRATION

6.1   <u>Mandatory Arbitration</u>.  In consideration of the terms and conditions set forth herein, including the Company's grant of the Option to the Participant, the Participant and the Company voluntarily promise and agree to arbitrate any and all claims and disputes covered by this Agreement. The arbitration shall be binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("*AAA*") and the National Rules for the Resolution of Employment Disputes ("*Employment Dispute Rules*") in effect on the date the arbitration is commenced in accordance with this Agreement.  AAA's Employment Dispute Rules shall govern disputes concerning the term or termination of the Participant's employment; all federal, state, or local laws, regulations, statutes, or policies prohibiting employment discrimination and/or harassment (including, without limitation, discrimination or harassment based on race, sex, national origin, religion, age, or disability) and/or unlawful retaliation in termination of employment in violation of any public policy; any policy, compensation, or benefit plan of the Company, excluding the Company's equity incentive plans; and claims for personal, emotional or physical injury not otherwise governed by workers' compensation. The Commercial Arbitration Rules of AAA shall govern all other disputes relating to the Company's equity incentive plans, including, without limitation, disputes relating to this Agreement.  The provisions of this Agreement shall govern the rights of all parties hereto, including but not limited to any party claiming for or on behalf of the Participant, including the Participant's heirs, successors, assigns, personal representatives and bankruptcy trustees. The Participant and the Company further agree that binding arbitration pursuant to this Agreement shall be the sole, exclusive, and final remedy for resolving any such claims and disputes.

6.2   <u>Claims Covered By Mandatory Arbitration Agreement</u>. With the exception of only those claims specifically excluded in Section 6.3 below, the provisions of Section 6.1 cover all legally actionable claims that the Participant may currently, or in the future, have against Company, including without limitation, the following:

(a)    any and all claims arising under any alleged or actual contract, agreement, or covenant (oral, written, or implied), including this Agreement, between the Participant and Company relating to the Participant's employment, the termination of the Participant's employment, directorship and/or consultancy or an equity incentive award provided to the Participant;

(b)    any and all claims arising under any policy, compensation, or benefit plan of the Company or any Subsidiary, including the Company's equity incentive plans, unless the decision at issue was made by an entity other than the Company or a Subsidiary, in which case the agreement that arbitration is the exclusive remedy applies only to the Participant's claims against the Company or any Subsidiary;

(c)    any and all claims arising under any federal, state, or local law, regulation, statute, or policy prohibiting employment discrimination and/or harassment, (including, without limitation, discrimination or harassment based on race, sex, national origin, religion, age, or disability) and/or unlawful retaliation;

(d)    any and all claims arising under any public policy;

(e)    any and all claims for personal, emotional, physical, or economic injury; and

(f)    any and all claims relating to any other rights, obligations, or duties arising out of constitutions, statutes or common law, whether or not specifically referred to in this Agreement, and whether similar to or dissimilar to rights, obligations, or duties referred to in this Agreement, which are or may be granted to any party to this Agreement by the laws of any state or country in which either party resides or engages in the business of the Company.

6.3    Claims Excluded From Arbitration Agreement. The only claims not subject to Section 6.1 are limited to:

(a)    any claim by the Participant for workers' compensation benefits;

(b)    any claim by the Participant for benefits under a benefit plan of the Company which provides its own arbitration procedure;

(c)    any claim by a party involving violation of rules, regulations, or laws governing insider trading;

(d)    any claim prohibited from binding arbitration by applicable laws or public policy; and

(e)    any claim brought before the Equal Employment Opportunity Commission, however, notwithstanding the foregoing, the Participant agrees that the Participant's sole recovery for any damages shall be through the binding arbitration process described herein.

6.4    Procedures.

(a)    A written request for mediation/arbitration which contains a specific statement of the acts complained of and the statutory or other violation alleged, must be served by mail on the other party, and in duplicate (with a copy of this Agreement attached) on the AAA office in Phoenix, Arizona or the AAA regional office in which Phoenix is located. The Company shall be served at its principal place of business at such time, and Holder shall be served at the home address shown in his/her personnel file at

A-8

such time. The request shall set forth the names, addresses, and telephone numbers of the parties; the amount in controversy, if any; the remedy sought; and that the hearing location agreed upon is Phoenix, Arizona. The request must be filed within the time limit established by the applicable statute of limitations necessary to perfect an administrative claim or initiate a lawsuit, whichever is sooner, if the dispute involves statutory rights, and when statutory rights are not at issue, within one year of the day on which the act complained of occurred, or notice thereof was given, whichever occurs first.

(b)      The parties shall attempt in good faith to select one person by agreement to mediate the dispute. The mediator, after consultation with the parties, will determine the mediation procedures to be followed. The fees and expenses of the mediator, if any, will be paid by the Company. If no mutual agreement can be reached as to such person, then the dispute will be settled by binding arbitration under the procedures set forth below. No mediation shall exceed two hours without the Company's written agreement to lengthen the mediation. Mediation is not binding on either party.

(c)      If the dispute is not resolved by discussion or mediation within 30 days of the request for mediation/arbitration, AAA shall administer the arbitration. AAA shall appoint an arbitrator within 30 days of AAA's receipt of notice that the matter was not, or will not be, resolved through mediation. The arbitrator must be licensed to practice law in the state in which the arbitration is convened, and the arbitrator shall, by virtue of background and similar experience, be knowledgeable in matters pertaining to equity compensation agreements and employment relationships and disputes.

(d)      The arbitrator may establish rules for the conduct of the arbitration consistent with the terms of this Agreement and the applicable AAA rules. Each party shall have the presumptive right to take two depositions at their own expense. The arbitrator may order additional depositions for good cause shown and such other discovery as the arbitrator considers necessary. Each party shall be entitled to counsel of its choice. All proceedings shall be deemed private and confidential and shall not be disclosed to the public by either the arbitrator or the parties to the arbitration, except as required by legal process or as necessary to judicially challenge an arbitration award under the grounds set forth below. The arbitrator shall have the authority to entertain motions to dismiss and/or motions for summary judgment by any party and shall apply the standards governing such motions under the Federal Rules of Civil Procedure.

(e)      In arbitrations governed by the Commercial Arbitration Rules of AAA, not earlier than 30 nor more than 45 days after appointment, the arbitrator shall conduct a preliminary hearing in accordance with AAA's "Guidelines for Expediting Large, Complex Commercial Arbitrations." Not less than five days prior to the preliminary hearing, all parties to the arbitration shall serve upon all other parties to the arbitration a written list of witnesses and exhibits to be used in the arbitration hearing. Except for good cause shown, no witness or exhibit may be utilized at the arbitration hearing other than those set forth on such list. The arbitrator shall have the power to compel production of documents at the hearing by subpoena. Each party shall be entitled to counsel of its choice. All proceedings and information provided at the hearings shall be deemed private and confidential and shall not be disclosed to the public by either the arbitrator or the parties to the arbitration. The arbitrator shall have the authority to entertain motions to dismiss and/or motions for summary judgment by any party and shall apply the standards governing such motions under the Federal Rules of Civil Procedure.

(f)      Also in arbitrations governed by the Commercial Arbitration Rules, the arbitrator shall receive evidence in a single hearing which shall be conducted in Phoenix, Arizona. The hearing shall commence not more than 60 days after the appointment of the arbitrator.

(g)      In arbitrations governed by the Employment Dispute Rules, the arbitrator shall conduct an Arbitration Management Conference with the parties not later than 60 days after appointment,

and shall thereafter conduct the Arbitration in Phoenix, Arizona at a time and date set after consultation with the parties during the Management Conference.

(h)     The arbitrator shall issue such award as is proper under the applicable substantive law of Arizona or of the United States, as the case may be, and the evidence. The arbitrator shall have no power or authority to add to or, except as otherwise provided in Section 7.7 hereof, to detract from the Agreement of the parties. The arbitrator shall not have authority to alter the terms or conditions of employment lawfully established by the Company, nor modify or disregard the standards of professional conduct and performance set by the Company in good faith, but shall only determine whether the law has been violated by the acts of either party as specifically alleged.

(i)     The arbitrator shall issue a final award not more than 20 days following the conclusion of the hearing. The arbitrator shall have authority to grant injunctive relief in a form substantially similar to that which would otherwise be granted by a court of law. The arbitrator shall issue a written opinion setting forth a statement of the grounds for the award and the method of determining damages, if any, awarded. The award shall be final and binding on all parties and may be entered as a judgment, under seal, and enforced, or injunctive relief maybe sought, in any court of competent jurisdiction. Judicial modification of the award shall be limited to situations in which the arbitrator fails or refuses to apply controlling law or the valid and enforceable terms of this Agreement.

(j)     The arbitrator shall be entitled to receive reasonable compensation at an hourly rate to be established by agreement between the arbitrator and AAA. All fees and expenses of the arbitration, including a transcript if either party requests, will be borne by the parties equally, except that in arbitrations governed by the Employment Dispute Rules, the fees and expenses will be borne by the parties as follows: the Participant shall pay an amount equivalent to the filing fee in Arizona District Court, plus one-half of the expense of the transcript, and any other amounts deemed fair and reasonable by the arbitrator; the Company shall bear the remaining fees and expenses of the arbitration. Each party will pay for the fees and expenses of its own attorneys, experts, witnesses and the presentation of proof and post-hearings briefs, unless the party prevails on a claim for which attorneys' fees are recoverable by statute or contract, and the arbitrator awards such fees.

(k)     Either party may bring an action in a court of competent jurisdiction to compel arbitration under this Agreement, to seek to vacate an arbitration award, and to enforce an arbitration award. Except as otherwise provided in this Agreement, the Participant agrees that the Participant will not initiate or prosecute any lawsuit in any way related to any claim covered by this Agreement.

    6.5    <u>Miscellaneous Provisions</u>. For the purposes of the arbitration provisions of this Article VI:

(a)     The term *"Company"* includes all related entities, all directors, officers, employees, agents, representatives, benefit plans, benefit plan sponsors, fiduciaries, administrators, or affiliates of any of the above, and all successors and assigns of any of the above excluding the Participant.

(b)     If either party pursues a covered claim against the other by action, method or legal proceeding other than arbitration as provided herein, the responding party shall be entitled to dismissal or injunctive relief regarding such action and shall be entitled to recover all costs, losses, and attorneys' fees related to such other action or proceeding.

A-10

## ARTICLE VII

## OTHER PROVISIONS

7.1     <u>Administration</u>.   The Administrator shall have the power to interpret the Plan, this Agreement and the Grant Notice and to adopt such rules for the administration, interpretation and application of the Plan as are consistent therewith and to interpret, amend or revoke any such rules.  All actions taken and all interpretations and determinations made by the Administrator in good faith shall be binding, conclusive and final upon the Participant, the Company and all other interested persons.  No member of the Administrator shall be personally liable for any action, determination or interpretation made in good faith with respect to the Plan, this Agreement or the Option.  In its absolute discretion, the Board may at any time and from time to time exercise any and all rights and duties of the Administrator under the Plan and this Agreement.

7.2     <u>Option Not Transferable</u>.

(a)     Subject to Section 7.2(b), the Option may not be sold, pledged, assigned or transferred in any manner other than by will or the laws of descent and distribution.  Neither the Option nor any interest or right therein shall be liable for the debts, contracts or engagements of the Participant or his or her successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy), and any attempted disposition thereof shall be null and void and of no effect, except to the extent that such disposition is permitted by the preceding sentence.

(b)     Notwithstanding any other provision in this Agreement, with the consent of the Administrator and to the extent the Option is not designated as an Incentive Stock Option, the Option may be transferred to one or more Permitted Transferees, subject to the terms and conditions set forth in Section 11.1(b) of the Plan.

(c)     Unless transferred to a Permitted Transferee in accordance with Section 7.2(b), during the lifetime of the Participant, only the Participant may exercise the Option or any portion thereof.  Subject to such conditions and procedures as the Administrator may require, a Permitted Transferee may exercise the Option or any portion thereof during the Participant's lifetime.  After the death of the Participant, any exercisable portion of the Option may, prior to the time when the Option becomes unexercisable under Section 3.3, be exercised by the Participant's personal representative or by any person empowered to do so under the deceased the Participant's will or under then applicable laws of descent and distribution.

7.3     <u>Restrictive Legends and Stop-Transfer Orders</u>.

(a)     The share certificate or certificates evidencing the shares of Stock purchased hereunder shall be endorsed with any legends that may be required by any applicable federal or state securities laws.

(b)     The Participant agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)     The Company shall not be required: (i) to transfer on its books any shares of Stock that have been sold or otherwise transferred in violation of any of the provisions of this Agreement, or (ii) to treat as owner of such shares of Stock or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such shares shall have been so transferred.

7.4     <u>Shares to Be Reserved</u>. The Company shall at all times during the term of the Option reserve and keep available such number of shares of Stock as will be sufficient to satisfy the requirements of this Agreement.

7.5     <u>Notices</u>. Any notice to be given under the terms of this Agreement to the Company shall be addressed to the Company at its principal place of business in care of the Secretary of the Company, and any notice to be given to Holder shall be addressed to Holder at the most recent address indicated in his or her personnel file at such time. By a notice given pursuant to this Section 7.5, either party may hereafter designate a different address for notices to be given to that party. Any notice which is required to be given to the Participant shall, if the Participant is then deceased, be given to the person entitled to exercise his or her Option pursuant to Section 4.1 by written notice under this Section 7.5. All notices and communications shall be deemed to have been received unless otherwise set forth herein: (i) in the case of personal delivery, on the date of such delivery; (ii) in the case of email, on the date of transmission; (iii) in the case of facsimile transmission, on the date on which the sender receives electronic confirmation that such notice was received by the addressee; (iv) in the case of overnight air courier, on the second business day following the day sent, with receipt confirmed by the courier; and (v) in the case of delivery by certified or registered mail (return receipt requested) on the fifth business day following the date such mailing is deposited in a post office or branch post office regularly maintained by the United States Postal Service.

7.6     <u>Titles</u>. Titles are provided herein for convenience only and are not to serve as a basis for interpretation or construction of this Agreement.

7.7     <u>Governing Law; Severability; Choice of Forum</u>. This Agreement shall be administered, interpreted and enforced under the laws of the State of Delaware, without regard to the conflicts of law principles thereof. Should any provision of this Agreement be determined by a court of law to be illegal or unenforceable, the other provisions shall nevertheless remain effective and shall remain enforceable. To the extent that any provision of this Agreement is held to be illegal or unenforceable because it is overbroad, that provision shall not be void but shall be limited only to the extent required by applicable law and enforced as so limited. Any arbitration, application for injunctive relief, or litigation relating to the Option shall be filed and conducted in Maricopa County, Arizona.

7.8     <u>Non-Waiver of Rights</u>. The Company's failure to enforce at any time any of the versions of this Agreement or to require at any time performance by the Participant of any of the provisions hereof shall in no way be construed to be a waiver of such provisions or to affect either the validity of this Agreement, or any part hereof, or the right of Company thereafter to enforce each and every provision in accordance with the terms of this Agreement.

7.9     <u>Conformity to Securities Laws</u>. The Participant acknowledges that the Plan is intended to conform to the extent necessary with all provisions of the Securities Act and the Exchange Act and any and all regulations and rules promulgated by the Securities and Exchange Commission thereunder, and state securities laws and regulations. Notwithstanding anything herein to the contrary, the Plan shall be administered, and the Option is granted and may be exercised, only in such a manner as to conform to such laws, rules and regulations. To the extent permitted by applicable law, the Plan and this Agreement shall be deemed amended to the extent necessary to conform to such laws, rules and regulations.

A-12

7.10    Amendments.  This Agreement may not be modified, amended or terminated except by an instrument in writing, signed by the Participant or such other person as may be entitled to exercise the Option pursuant to Section 4.1 and by a duly authorized representative of the Company.

7.11    Successors and Assigns.  Subject to the terms and conditions of the Plan, this Agreement shall inure to the benefit of and be binding on the successors and assigns of the Company.  Subject to the restrictions on transfer herein set forth in Section 7.2, this Agreement shall be binding upon the Participant and his or her heirs, executors, administrators, successors and assigns.

7.12    Notification of Disposition.  If this Option is designated as an Incentive Stock Option, the Participant shall give prompt notice to the Company of any disposition or other transfer of any shares of Stock acquired under this Agreement if such disposition or transfer is made (a) within two years from the Grant Date with respect to such shares or (b) within one year after the transfer of such shares to the Participant.  Such notice shall specify the date of such disposition or other transfer and the amount realized, in cash, other property, assumption of indebtedness or other consideration, by the Participant in such disposition or other transfer.

7.13    Limitations Applicable to Section 16 Persons.  Notwithstanding any other provision of the Plan or this Agreement, if the Participant is subject to Section 16 of the Exchange Act, the Plan, the Option and this Agreement shall be subject to any additional limitations set forth in any applicable exemptive rule under Section 16 of the Exchange Act (including any amendment to Rule 16b-3 of the Exchange Act) that are requirements for the application of such exemptive rule.  To the extent permitted by applicable law, this Agreement shall be deemed amended to the extent necessary to conform to such applicable exemptive rule.

7.14    Entire Agreement.  The Plan, the Grant Notice (including all Exhibits thereto) and this Agreement constitute the entire agreement of the parties and supersede in their entirety all prior undertakings and agreements of the Company and the Participant with respect to the subject matter hereof.

UPON ENTERING INTO THIS AGREEMENT, THE PARTICIPANT WARRANTS THAT HE/SHE HAS CAREFULLY READ THIS AGREEMENT, UNDERSTANDS ITS TERMS, AND HAS VOLUNTARILY AGREED TO ENTER INTO IT WITHOUT RELIANCE ON ANY REPRESENTATIONS OR PROMISES BY THE COMPANY OTHER THAN AS SET FORTH IN THIS AGREEMENT.

THE PARTICIPANT HAS HAD SUFFICIENT OPPORTUNITY BEFORE SIGNING THE AGREEMENT TO ASK ANY QUESTIONS THE PARTICIPANT HAS ABOUT THE AGREEMENT AND HAS RECEIVED SATISFACTORY ANSWERS TO ALL SUCH QUESTIONS.

THE PARTICIPANT UNDERSTANDS THE PARTICIPANT'S RIGHTS AND OBLIGATIONS UNDER THIS AGREEMENT AND VOLUNTARILY ENTERS INTO IT.

THE PARTICIPANT ACKNOWLEDGES THE PARTICIPANT'S "AT-WILL" EMPLOYMENT STATUS.

THE PARTICIPANT RECOGNIZES THE PARTICIPANT'S WAIVER OF RIGHT TO A JURY TRIAL BY AGREEING TO MANDATORY ARBITRATION.

THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION. THE ARBITRATION PROVISION MAY BE ENFORCED BY THE COMPANY AND BY YOU.

## EXHIBIT B

## TO STOCK OPTION GRANT NOTICE

## FORM OF EXERCISE NOTICE

Effective as of today, _____ ___, 20___, the undersigned hereby elects to exercise the option to purchase the number of shares of Class A common stock, par value $0.014 per share, specified below (the "*Shares*") of Medicis Pharmaceutical Corporation, a Delaware corporation (the "*Company*"), granted pursuant to the Medicis 2006 Incentive Award Plan (the "*Plan*"), the Stock Option Grant Notice dated as of _____, 20___ and the Stock Option Agreement attached thereto (the "*Stock Option Agreement*"). Capitalized terms used herein without definition shall have the meanings given in the Plan and, if not defined in the Plan, the Option Agreement.

| | |
|---|---|
| **Participant:** | _____ |
| **Grant Date:** | _____ |
| **Number of Shares as to which Option is Exercised:** | _____ |
| **Exercise Price per Share:** | $_____ |
| **Total Exercise Price:** | $_____ |
| **Certificate to be issued in name of:** | _____ |
| **Payment delivered herewith:** | $_____ (Representing the full exercise price for the Shares, as well as any applicable withholding tax) |

Form of Payment: _____

_____
*(Please specify)*

**Type of Option:**        ☐ Incentive Stock Option    ☐ Non-Qualified Stock Option

The Participant acknowledges that the Participant has received, read and understood the Plan and the Stock Option Agreement. The Participant agrees to abide by and be bound by their terms and conditions. The Participant understands that the Participant may suffer adverse tax consequences as a result of the Participant's purchase or disposition of the Shares. The Participant represents that the Participant has consulted with any tax consultants the Participant deems advisable in connection with the purchase or disposition of the Shares and that the Participant is not relying on the Company for any tax advice. The Plan and Option Agreement are incorporated herein by reference.

Remainder of page intentionally left blank.

OC\828200.2

This Exercise Notice, the Plan, the Stock Option Agreement and the Grant Notice constitute the entire agreement of the parties and supersede in their entirety all prior undertakings and agreements of the Company and the Participant with respect to the subject matter hereof.


**ACCEPTED BY:**
**MEDICIS PHARMACEUTICAL**
**CORPORATION**


By: _____

Print Name: _____

Title: _____

**SUBMITTED BY**
**PARTICIPANT:**


By: _____

Print Name: _____

Address: _____

_____

OC\828200.2

**EXHIBIT C**

**TO STOCK OPTION GRANT NOTICE**

**MEDICIS 2006 INCENTIVE AWARD PLAN**

**EXHIBIT D**

**TO STOCK OPTION GRANT NOTICE**

**MEDICIS 2006 INCENTIVE AWARD PLAN PROSPECTUS**

DAVID F. FAUSTMAN, State Bar No. 081862
CRISTINA K. OLIVELLA, State Bar No. 246156
FOX ROTHSCHILD LLP
235 Pine Street, Suite 1500
San Francisco, California 94104
Tel:  415-364-5540
Fax: 415-391-4436
dfaustman@foxrothschild.com
colivella@foxrothschild.com

Attorneys for Defendants
MEDICIS PHARMACEUTICAL CORPORATION and
ROBERT NEVIN

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMBERLEA MCMANIGAL, an individual,<br><br>                    Plaintiffs,<br><br>            vs.<br><br>MEDICIS PHARMACEUTICAL CORPORATION, a Delaware corporation, ROBERT NEVIN, an individual,<br><br>                    Defendants. | Case No. 3:07-cv-04874 TEH<br><br>**DECLARATION OF CRISTINA OLIVELLA IN SUPPORT OF DEFENDANTS' MOTION FOR ORDER COMPELLING ARBITRATION**<br><br>Date:  February 25, 2008<br>Time:  10:00 a.m.<br>Courtroom:  12, 19th Floor<br><br>Complaint filed:  July 23, 2007 |

FOX ROTHSCHILD LLP
235 PINE STREET
SUITE 1500
SAN FRANCISCO, CA 94104

DECLARATION OF CRISTINA OLIVELLA IN SUPPORT OF DEFENDANTS'
MOTION FOR ORDER COMPELLING ARBITRATION
WCI 22030v1 01/21/08

1    I, Cristina Olivella, declare as follows:

2    1.    I am an attorney duly licensed in the state of California and the Northern District of

3    California. I am an associate of Fox Rothschild, LLP, attorneys of record for Defendants Medicis

4    Pharmaceutical Corporation ("Medicis") and Robert Nevin. I submit this declaration in support

5    of Defendants' Motion for Order Compelling Arbitration. I have personal knowledge of the facts

6    following facts, and can competently testify thereto if called upon to do so.

7    2.    On July 23, 2007, Plaintiff Kimberlea McManigal filed a complaint for damages against

8    Defendants ("Complaint"). Attached hereto as Exhibit 4 is a true and correct copy of the

9    Complaint. This case was removed to federal court.

10    3.    On or about September 18, 2007, the lead defense attorney on this case, David Faustman

11    of Fox Rothschild LLP, contacted Plaintiff's counsel to request arbitration of this matter.

12    Attached hereto as Exhibit 5 is a true and correct copy of a letter from Mr. Faustman to Plaintiff's

13    counsel requesting arbitration and attaching Ms. McManigal's arbitration agreement.

14    4.    On September 26, 2007, I spoke with Mr. Whitney Leigh, counsel for Ms. McManigal,

15    regarding Ms. McManigal's arbitration agreement. I explained that the agreement was

16    electronically signed. To facilitate an informal resolution of the arbitration issue, I further

17    indicated that the Defendant was willing to waive any part of the arbitration agreement that was

18    inconsistent with *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal.4th 83, 98

19    (2000) or its progeny. I specifically told Mr. Leigh that the defense was willing to waive the cost-

20    sharing provision and the venue provision. Attached hereto as Exhibit 6 is a true and correct copy

21    of a letter sent to Mr. Leigh confirming this conversation.

22    I declare under penalty of perjury under the laws of the state of California, that the

23    foregoing is true and correct. Executed this 21st day of January 2008 in San Francisco,

24    California.

25

26    Cristina Olivella

27

28                                                      2

FOX ROTHSCHILD LLP
235 PINE STREET
SUITE 1500
SAN FRANCISCO, CA 94104
WC1 22030v1 01/21/08

EXHIBIT 4

G. WHITNEY LEIGH (SBN 153457)
GONZALEZ & LEIGH LLP
Two Shaw Alley, Third Floor
San Francisco, CA 94105
Telephone: (415) 512-2000
Facsimile: (415) 512-2001

IMAGED

JUL 2 3 2007

**FILED**
San Francisco County Superior Court

JUL 2 3 2007

GORDON PARK-LI, Clerk
By: _____
DEBORAH STEFFE, Deputy Clerk

JUAN ENRIQUE PEARCE (SBN 236228)
PEARCE LAW OFFICES
530 Jackson Street, Second Floor
San Francisco, CA 94133
Telephone: (415) 434-9000
Facsimile: (415) 434-9010

CASE MANAGEMENT CONFERENCE SET

DEC 3 1 2007  -9 AM

DEPARTMENT 212

**SUMMONS ISSUED**

Attorneys for Plaintiff
KIMBERLEA MCMANIGAL

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**CITY AND COUNTY OF SAN FRANCISCO**

KIMBERLEA MCMANIGAL, an individual,
and ROES 1 through 50,

                                        Plaintiff,

          v.

MEDICIS PHARMACEUTICAL
CORPORATION, a Delaware corporation,
ROBERT NEVIN, an individual, and ROES 1
through 50,

                                        Defendants.

CASE NO. C G C - 0 7 - 4 6 5 3 9 8

**COMPLAINT FOR:**

1. **DISCRIMINATION BASED ON SEX IN VIOLATION OF GOVERNMENT CODE SECTION 12940(a);**
2. **HARASSMENT BASED ON SEX IN VIOLATION OF GOVERNMENT CODE SECTION 12940(j);**
3. **FAILURE BY EMPLOYER TO TAKE CORRECTIVE ACTION REGARDING HARASSMENT BASED ON SEX IN VIOLATION OF GOVERNMENT CODE SECTION 12940(k);**
4. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**JURY TRIAL DEMANDED**

Plaintiff hereby alleges through her counsel the following:

**INTRODUCTION**

1.    This case is borne from discriminatory and harassing conduct on the part of Medicis Pharmaceutical Corporation ("Medicis") and Robert Nevin based upon Plaintiff's sex. After Plaintiff announced her pregnancy to her employer, Medicis, and her immediate supervisor, Robert Nevin, Defendants subjected Plaintiff to continual discriminatory and harassing behavior that includes threats

1

COMPLAINT                                        McManigal v. Medicis
                                                 Case No. _____

1  on her job, threats on promotions, denial of bonus compensation, arbitrary reprimands and abject

2  failure to take corrective action regarding the discriminatory and harassing behavior.

3         2.     Plaintiff first sought assistance to curb this unlawful behavior from the Human

4  Resources Department at Medicis.  But rather than support one of its employees who was being

5  attacked because of her sex, Medicis chose to laugh off Plaintiff's complaints of discrimination and

6  harassment—offering no assistance and not intervening to end the discrimination and harassment that

7  Plaintiff faced.

8         3.     Plaintiff has challenged Defendants' discriminatory and harassing conduct on

9  numerous occasions.  Each time she has spoken out in an attempt to assert her civil rights, Plaintiff has

10 been faced retaliation and disparagement about her work ethic and professionalism.  On more than one

11 occasion, Defendants have, in a concerted effort, sought to intimidate and prevent Plaintiff from

12 asserting her rights.

13                            JURISDICTION AND VENUE

14        4.     This Court has jurisdiction over causes of action asserted herein related to Government

15 Code Section 12940, which is a California state statute that expressly invokes the state's police power.

16 CAL. GOVT. CODE § 12920.

17        5.     This Court has jurisdiction over Plaintiff's claim for intentional infliction of emotional

18 distress.  The facts supporting this cause of action arise out of conduct undertaken by Defendants in

19 San Francisco County, State of California.

20        6.     Each Defendant has sufficient minimum contacts with the State of California, is a

21 citizen of the State of California, or otherwise intentionally availed itself of the State of California so

22 as to render the exercise of jurisdiction over it by the State of California courts, consistent with

23 traditional notions of fair play and substantial justice.

24        7.     Plaintiff exhausted her administrative remedies by filing administrative complaints

25 against Defendants with the California Department of Fair Employment and Housing ("Department").

26 Plaintiff received right-to-sue letters from the Department for case numbers E200607A0984-00-prac

27 and E200607A0984-01-prsc conferring upon her the right to file suit against Defendants.  Plaintiff

28 subsequently served the right-to-sue letters on Defendants, as required by law.

- 2 -

1    **8.**    Venue is proper in this Court under because the injuries sustained by Plaintiff and the

2    causes of action beflying this Complaint occurred in San Francisco County, State of California.

3    **FACTUAL BACKGROUND**

4    **A.**    **Defendants' unlawful discrimination began during Plaintiff's Interview.**

5    **9.**    Plaintiff Kimberlea McMonagle is a Territory Manager for Medicis, a company that

6    sells dermatological pharmaceutical and aesthetic products largely marketed toward women. The

7    duties of the Territory Manager include being assigned a geographic area, or territory, for which an

8    individual is charged with developing contacts with physicians and demonstrating Medicis products to

9    those physicians.

10    **10.**    Plaintiff first learned of the Territory Manager job opportunity at Medicis in or about

11    June 2005.

12    **11.**    Plaintiff interviewed for a position of Territory Manager at Medicis with Regional

13    Manager Nancy Fong, and later, Defendant Robert Nevin. During an interview with Defendant

14    Nevin, Defendant Nevin expressly asked Plaintiff to disclose her marital status and whether or not she

15    had any children. Plaintiff took great offense to these questions, as they are in no way related to the

16    job duties of Territory Manager. Plaintiff considered those questions to be discriminatory and

17    harassing in nature — designed to send a message that women with children were not welcomed at

18    Medicis.

19    **12.**    Despite her reservations regarding Defendant Nevin's questions and underlying

20    motives, Plaintiff accepted a Territory Manager position with Medicis on August 8, 2005. It was

21    Plaintiff's fervent hope that the discriminatory and harassing comments were aberrations to the

22    conduct of Defendant Nevin and Medicis' corporate policy.

23

24    **B.**    **Defendant Nevin frequently made derogatory remarks about women in Plaintiff's presence.**

25    **13.**    Since the time in which she has worked at Medicis, Plaintiff has been made to suffer

26    through a continual barrage of derogatory comments that Defendant Nevin makes about women.

27    Defendant Nevin's commentary was specifically designed to intimidate Plaintiff and send a clear

28    message that pregnant employees are not welcome at Medicis. Defendant Nevin's communications

*McMonagle v. Medicis, et al.*
Case No.

COMPLAINT

1   about women and pregnancy leave little doubt but that women held a lower, less valuable place at

2   Medicis than their male counterparts.

3       14.    For example, in October of 2005, Mr. Nevin implied that women should work through

4   their pregnancy and not take maternity leave, stating with fondness that there was a time when women

5   would work in the potato field, go inside to have a baby, and go back to the potato field the same day.

6       15.    In March of 2006, Defendant taunted Plaintiff based on her sex yet again.  Specifically,

7   when Plaintiff expressed interest in a client development trip to the NCAA Men's Basketball

8   Tournament, Defendant Nevin replied to her that she would never be invited on such a trip because it

9   was a "boy's trip".

10       16.    Sometime in the fall of 2006, Defendant Nevin stated that he could hire "a college

11   chick with blonde hair and big tits" who would sell more than one of Plaintiff's male colleagues.

12       17.    On several occasions Defendant Nevin lamented to Plaintiff that he cannot interact with

13   her like he does with male employees.  In addition, he has commented to other male employees that he

14   doesn't like dealing with women because women cry.

15       18.    In yet another instance that did not involve Defendant Nevin, Plaintiff reviewed an

16   evaluation form for a candidate applying for a position at Medicis on which the Medicis interviewer

17   had written positive comments associated with that applicant's not having any children.  These

18   comments stated that because the candidate did not have children, she could devote most of her time

19   to work.  This evaluation was eventually sent to the Medicis corporate office.

20       **C.**    **Despite the continual discrimination and harassment at work, Plaintiff performs**
        **her work duties in a satisfactory manner.**

21       19.    In the years 2005 and 2006, Plaintiff worked hard to build up her clientele for the

22   Medicis products she was charged with promoting.  Plaintiff regularly received praise from her

23   physician/clients.

24       20.    Plaintiff was increasingly successful in discharging her employment duties, as

25   measured by Medicis's own rankings system. As of the fourth quarter of 2006, Plaintiff enjoyed a

26   ranking of 32 out of 51.  In addition, Plaintiff ranked #1 in sales growth for the product "Plexion" and

27   #5 for the product "Triaz".

28

-4-

21.   During 2005, Plaintiff earned a base salary of $68,000; in 2006, Plaintiff earned a base salary of $69,360.

22.   From the time she was hired through the fall of 2007, Plaintiff never received any negative written or verbal performance evaluations. In 2006, she received a merit increase in her base salary and a stock grant for good performance. Additionally, Plaintiff received another merit-based increase to her base salary in March 2007.

**D.   Defendants' discriminatory and harassing behavior increased when Plaintiff informed them of her pregnancy.**

23.   In early November 2006, Plaintiff informed her supervisor, Robert Nevin, that she was pregnant. Defendant Nevin's reaction was swift and severe. He immediately charted out a plan to systematically discredit Plaintiff's work record simply because she dared to get pregnant.

24.   Defendant Nevin's plan manifested itself in a series of pretextual reprimands for Plaintiff's supposed failure to follow company policy.

25.   Approximately two weeks after Plaintiff announced her pregnancy, Defendant Nevin telephoned Plaintiff to reprimand her for supposed poor performance. During the conversation, Defendant Nevin stated that his superiors wanted her to be fired or, at very least, to be put on a performance plan. Defendant Nevin claimed that, "[i]f it was not for me, you would be out of a job right now [sic]."

26.   During this call Defendant Nevin also stated, "[y]ou have two choices: bring up the numbers or you know the other choice." By this statement, Plaintiff believed Defendant Nevin was threatening her job.

27.   Defendant Nevin went on to state that he understood that Plaintiff was pregnant. "This should be a happy time for you, not a miserable time," he stated. "But you have to understand the way this company works." He later suggested to Plaintiff that she should consider whether or not Medicis was an appropriate place for her to work.

28.   In December 2006, Plaintiff did not receive any discretionary bonus, although she was performing as well or better than others who had received such bonuses. In particular, Plaintiff was ranked number one in Q3 for the Northwest Region for Solodyn, a difficult-to-sell new product.

- 5 -

29.    On January 15, 2007, while attending an out-of-town meeting, Plaintiff was denied her own room that, which, according to company policy, was to be provided to pregnant women.  When Plaintiff informed Defendant Nevin of this fact, he simply laughed it off, and did nothing correct the situation.

30.    On January 19, 2007, after a physician complained to Plaintiff's superiors about a paperwork error that delayed the physician's payment, Defendant Nevin contacted Plaintiff and again threatened her job.  Defendant Nevin implied that because she was pregnant she was not focused on her work responsibilities and stated that she, "would be lucky to get out of this with a job."  Defendant Nevin further attempted to intimidate Plaintiff by falsely stating that the Medicis human resources department convened a meeting to discuss this incident.

31.    On January 29, 2007, Defendant Nevin, who had never previously notified Plaintiff regarding her failure to perform a simple, administrative task(s), tendered a formal disciplinary letter to Plaintiff outlining "an unacceptable pattern of behavior regarding administrative duties." Defendant Nevin chose to single Plaintiff out for failing to follow administrative procedure(s). Plaintiff believes that she was specially targeted, because other Territory Managers under Defendant Nevin's supervision, routinely ignore the administrative procedure(s) in question, without formal reprimands being issued.

32.    During a conversation related to the disciplinary letter, Defendant Nevin once again threatened to fire Plaintiff by yelling at Plaintiff, "Corporate wanted your job last Monday.  You're lucky to be here this week.  You have to sign the letter or you know your other option."

33.    Plaintiff believes this was a further attempt by Defendants to coerce a resignation from her.  Plaintiff believes that Defendants wanted her to resign because she was pregnant and, in the eyes of the Defendants, was no longer as useful to the company.

34.    In a subsequent conversation regarding the disciplinary letter, Defendant Nevin became enraged when Plaintiff refused to sign the letter.  Defendant Nevin specifically stated that he would go back and find out everything Plaintiff had ever done wrong while employed at Medicis.

35.    On January 30, 2007, Plaintiff complained to Amy Gajante at Human Resources about Defendant Nevin's discriminatory and harassing behavior.  Plaintiff was explicit in her description of

- 6 -

COMPLAINT

McManigal v. Medicis, et al.
Case No. _____

1    the discrimination and harassment to which she had been subjected. Plaintiff stated directly that

2    Defendant Nevin, "was harassing me and threatening my job because I'm pregnant."

3    36.    Incredibly, Ms. Gajurat's response as a Human Resources representative stated that

4    there was nothing that could be done about the situation. Ms. Gajurat's only suggestion to Plaintiff

5    was that she talk to Defendant Nevin directly about her complaints of discrimination and harassment.

6    37.    Defendant Medicis did not, in any manner, attempt to intervene or assist Plaintiff in

7    addressing the discriminatory and harassing abuse she had suffered.

8    38.    Thereafter, Defendant Nevin continued his pattern of discrimination and harassment

9    toward Plaintiff. Defendant Nevin threatened Plaintiff's job and determined to affect Plaintiff's work

10    reputation.

11    CAUSES OF ACTION

12    FIRST CAUSE OF ACTION

13    (Sex Discrimination)
(Against Medicis)

14    39.    Plaintiff reincorporates the allegations set forth in each and every preceding paragraph.

15    40.    Defendant Medicis discriminated against Plaintiff in compensation and/or in terms,

16    conditions, or privileges of employment based on her sex and pregnancy, by denying her bonus

17    compensation, promotions and benefits given to other employees, and in holding her to different

18    performance standards than other employees, and repeated threats on her job, in violation of

19    Government Code § 12940(a).

20

21    SECOND CAUSE OF ACTION

22    (Harassment based on Sex)
(Against both Defendants)

23    41.    Plaintiff incorporates the allegations set forth in each and every preceding paragraph.

24    42.    Defendants harassed Plaintiff based on her sex and pregnancy by creating a hostile

25    work environment. Defendants' unlawful harassment includes threats to her job, yelling and swearing

26    at her, holding her to different performance standard than other employees, subjecting her to arbitrary

27    disciplinary action, and denying her benefits given to other employees in violation of Government

28    Code § 12940().

- 7 -

### THIRD CAUSE OF ACTION
#### (Failure to take Corrective Action)
#### (Against Medicis)

43.     Plaintiff incorporates the allegations set forth in each and every preceding paragraph.

44.     Defendants failed to take all reasonable steps necessary to prevent discrimination and harassment from occurring. Even after Plaintiff reported the incidents of discrimination and harassment, Defendants took no corrective action whatsoever, in violation of Government Code § 12940(k).

### FOURTH CAUSE OF ACTION
#### (Intentional Infliction of Emotional Distress)
#### (Against both Defendants)

45.     Plaintiff incorporates the allegations set forth in each and every preceding paragraph.

46.     Defendants by and through their intentional and/or recklessly negligent and outrageous actions, caused Plaintiff severe emotional distress.

### PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

1.     For compensatory, general, and special damages against the Defendants as the law provides;

2.     For exemplary and punitive damages against Defendants in an amount sufficient to deter and to make an example of those Defendants as the law provide;

3.     For attorneys' fees and costs; and

4.     For such other relief as the Court finds just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury for the claims raised herein.

DATED:  July 23, 2007

Respectfully Submitted,

By _____

GILBERT

G. WHITNEY LEIGH
Attorneys for Plaintiff
KIMBERLEA MCMANIGAL

-8-

EXHIBIT 5



**Fox Rothschild** LLP
ATTORNEYS AT LAW

235 Pine Street, Suite 1500
San Francisco, CA 94104-2734
Tel 415.364.5540  Fax 415.391.4436
www.foxrothschild.com

September 18, 2007

**VIA FACSIMILE (415-512-2001 & 415-434-9010)**
**& U.S. MAIL**

G. Whitney Leigh, Esq.
Gonzalez & Leigh LLP
Two Shaw Alley, Third Floor
San Francisco, California 94104

Juan Enrique Pearce, Esq.
Pearce Law Offices
530 Jackson Street, Second Floor
San Francisco, California 94133

Re:    *Kimberlea McManigal v. Medicis Pharmaceutical Corp., et al.*
       Case No. CGC-07-465398

Dear Mr. Leigh and Mr. Pearce,

Enclosed is a copy of the arbitration agreement that I mentioned in my recent voicemails to you both. We believe that the claims set forth in the above-referenced litigation are subject to this arbitration agreement, and we ask that you stipulate to arbitrate the matter.

While we are prepared to compel arbitration if necessary, we hope to resolve this matter informally with your cooperation.

Please let us know at your earliest convenience if you will agree to stipulate to arbitration.

Very truly yours,

David F. Faustman

Enclosures

WCI 13866v1 09/18/07

A Pennsylvania Limited Liability Partnership

| California | Delaware | Florida | Nevada | New Jersey | New York | Pennsylvania |

# Grant Acceptance Report

**Medicis Pharmaceutical Corp.**

**Create Date:09/17/2007 11:50**

**Selection Criteria**

**First Name :**
**Last Name : mcmanigal**
**Employee ID :**
**SSN :**
**Grant Date From : Grant Date To :**
**Grant # :**
**Expiration Date From : Expiration Date To :**
**Acceptance Status Date From : Acceptance Status Date To :**
**Acceptance Status :**
**Participant Type : ALL**
**Access Country : ALL**
**Access Group : ALL**

| Last Name | First Name | Employee ID | Employee Type | Grant ID | Grant Date | Expiration Date | Unvested Qty | Exercisable | Grant Acceptance Status | Grant Acceptance Status Date |
|---|---|---|---|---|---|---|---|---|---|---|
| MCMANIGAL | KIMBERLEA A | 114727064 | Neither | 015253 | 02/07/2006 | 02/07/2013 | 135 | 0 | Accepted | 02/05/2007 |

THIS AGREEMENT is made as of Feb 07, 2006 (the "*Date of Grant*") by and between **MEDICIS PHARMACEUTICAL CORPORATION**, a Delaware corporation (the "*Corporation*"), and KIMBERLEA A MCMANIGAL (the "*Grantee* ").

WHEREAS, the Grantee is a valuable and trusted employee of the Corporation and the Corporation considers it desirable and in its best interests to grant the Grantee an award of restricted Stock (the "*Restricted Stock*") under the Medicis Pharmaceutical Corporation 2004 Stock Incentive Plan (the "*Plan*");

WHEREAS, Section 7 of the Plan states that Restricted Stock granted under the Plan shall be evidenced by an agreement incorporating such terms and conditions as the Committee in its absolute discretion deems desirable and consistent with the terms of the Plan;

WHEREAS, the Committee took action on the Date of Grant to authorize the issuance of the Restricted Stock to the Grantee; and

WHEREAS, the Grantee and the Corporation, together, consider it desirable and in their best interests to voluntarily promise and agree to submit to binding arbitration any and all claims covered by this Agreement, and to agree that binding arbitration pursuant to this Agreement shall be the sole, exclusive, and final remedy for resolving any such claims and disputes;

NOW, THEREFORE , in consideration of the premises and mutual covenants herein contained, it is agreed by and between the parties as follows:

1. **GRANT OF RESTRICTED STOCK.** Pursuant to Section 9 of the Plan, and subject to the terms and conditions set forth herein and in the Plan, the Corporation hereby grants to the Grantee, in the aggregate 150 shares of Restricted Stock, which shall be subject to the restrictions and conditions set forth in this Agreement.

2. **RESTRICTIONS.** Except as otherwise provided in this Agreement, the restrictions on the Restricted Stock are that the Stock will be forfeited by the Grantee and all of the Grantee's rights to such Stock shall immediately terminate without any payment or consideration by the Corporation, in the event of any sale, assignment, transfer, hypothecation, pledge or other alienation of such Restricted Stock made or attempted, whether voluntary or involuntary, and if involuntary whether by process of law in any civil or criminal suit, action or proceeding, whether in the nature of an insolvency or bankruptcy proceeding or otherwise, without the written consent of the Board of Directors of the Corporation (the "*Board*"), excluding the Grantee if he so serves on the Board (the "*Restrictions*").

3. **VESTING.** Except as otherwise provided herein or in the Plan, the Restrictions applicable to the Restricted Stock shall lapse (i.e., the Restricted Stock shall "vest") as to: (a) 10% of the shares of Restricted Stock on the first anniversary of the Date of Grant, (b) 10% of the shares of Restricted Stock on the second anniversary of the Date of Grant, (c) 20% of the shares of Restricted Stock on the third anniversary of the Date of Grant, (d) 30% of the shares of Restricted Stock on the fourth anniversary of the Date of Grant, and (e) 30% of the shares of Restricted Stock on the fifth anniversary of the Date of Grant (each such date, a "*Vesting Date*"). In no event shall Grantee vest in any additional shares of Restricted Stock following the termination of Grantee's Continuous Service. All remaining unvested shares of Restricted Stock shall automatically be forfeited upon Grantee's cessation of Continuous Service.

4. **CHANGE OF CONTROL.** In the event of a Change of Control (as defined below), the Restrictions shall lapse with respect to 100% of the Restricted Stock. For purposes hereof,

"Change of Control" means:

a. the acquisition, other than from the Corporation, by any individual, entity or group (within the meaning of Section 13(d) or 14(d)(2) of the Securities Exchange Act of 1934, as amended from time to time) (the "*Exchange Act*"), of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 25% or more of either (i) the then outstanding shares of Stock (the "*Outstanding Company Stock*") or (ii) the combined voting power of the then outstanding voting securities of the Corporation entitled to vote generally in the election of directors (the "*Company Voting Securities*"), provided, however, that any acquisition by (x) the Corporation or any of its subsidiaries, or any employee benefit plan (or related trust) sponsored or maintained by the Corporation or any of its subsidiaries or (y) any corporation with respect to which, following such acquisition, more than 50% of, respectively, the then outstanding shares of common stock of such corporation and the combined voting power of the then outstanding voting securities of such corporation entitled to vote generally in the election of directors is then beneficially owned, directly or indirectly, by all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Stock and Company Voting Securities immediately prior to such acquisition in substantially the same portion as their ownership, immediately prior to such acquisition of the Outstanding Company Stock and Company Voting Securities, as the case may be, shall not constitute a Change of Control of the Corporation; or

b. individuals who, as of the Effective Date, constitute the Board (the "**Incumbent Board** ") cease for any reason to constitute at least a majority of the Board, provided that any individual becoming a director subsequent to the Effective Date, whose election or nomination for election by the Corporation's shareholders was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual whose initial assumption of office is in connection with an actual or threatened election contest relating to the election of the Directors of the Corporation (as such terms are used in Rule 14a-11 of Regulation 14A promulgated under the Exchange Act); or

c. consummation of a reorganization, merger or consolidation (a "**Business Combination** "), in each case, with respect to which all or substantially all of the individuals and entities who were the respective beneficial owners of the Outstanding Company Stock and Company Voting Securities immediately prior to such Business Combination do not, following such Business Combination, beneficially own, directly or indirectly, more than 50% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination in substantially the same proportion as their ownership immediately prior to such Business Combination or the Outstanding Company Stock and Company Voting Securities, as the case may be; or

d. (i) a complete liquidation or dissolution of the Corporation or (ii) a sale or other disposition of all or substantially all of the assets of the Corporation other than to a corporation with respect to which, following such sale or disposition, more than 50% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors is then owned beneficially, directly or indirectly, by all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Stock and Company Voting Securities immediately prior to such sale or disposition in substantially the same proportion as their ownership of the Outstanding Company Stock and Company Voting Securities, as the case may be, immediately prior to such sale or disposition.

5. **CERTIFICATES.** Certificates representing the shares of Restricted Stock shall be issued and held by the Corporation in escrow until (i) their delivery to Grantee or Grantee's estate as set forth herein, subject to the delivery by Grantee or Grantee's estate of any documents which the Committee in its discretion may require as a condition to the issuance and delivery of shares or (ii) their forfeiture and transfer to the Corporation. Certificates representing shares of Restricted Stock in respect of which the restrictions have lapsed shall be delivered to Grantee or Grantee's estate as soon as practicable following each Vesting Date (less any shares used to satisfy the Corporation's withholding obligations, if applicable), provided that all applicable withholding requirements have been met. Any certificates issued in respect of shares of Restricted Stock, at the sole discretion of the Committee, shall bear an appropriate legend referring to the terms, conditions, and restrictions applicable to such Award, substantially in the following form:

```
"THE TRANSFERABILITY OF THIS CERTIFICATE AND THE COMMON STOCK

REPRESENTED HEREBY ARE SUBJECT TO THE TERMS AND CONDITIONS

(INCLUDING FORFEITURE) CONTAINED IN THE RESTRICTED STOCK AWARD

AGREEMENT DATED AS OF [_____ ___], 2006, ENTERED INTO BETWEEN THE

REGISTERED OWNER AND MEDICIS PHARMACEUTICAL CORPORATION."
```

At the expiration of the Restrictions, the Corporation shall redeliver to the Grantee (or his legal representative, beneficiary or heir) share certificates for the Stock deposited with it without any legend except as otherwise provided by the Plan, this Agreement or applicable law. During the period that the Corporation holds the shares of Restricted Stock in escrow, the Grantee shall have the right to receive dividends on and to vote the Restricted Stock while it is subject to restriction, except as otherwise provided by the Plan. If the Award is forfeited in whole or in part, the Grantee will assign, transfer, and deliver any evidence of the shares of Restricted Stock to the Corporation and cooperate with the Corporation to reflect such forfeiture. By accepting the Award, the Grantee acknowledges that the Corporation does not have an adequate remedy in damages for the breach by the Grantee of the conditions and covenants set forth in this Agreement and agrees that the Corporation is entitled to and may obtain an order or a decree of specific performance against the Grantee issued by any court having jurisdiction.

6. **ADJUSTMENT.** The Award may be adjusted as provided in the Plan including, without limitation, Section 11 of the Plan.

7. **NONTRANSFERABILITY; BENEFICIARIES.** This Award shall not be assignable or transferable by the Grantee, otherwise than by will or the laws of descent and distribution or pursuant to a beneficiary designation.

8. **REPRESENTATIONS AND WARRANTIES OF THE GRANTEE.**

a. Upon receipt of the shares of Stock of the Corporation as a result of the lapse of the Restrictions of the Restricted Stock, the Grantee, if so requested by the Corporation, shall represent and warrant to the Corporation that the Grantee is acquiring the shares of Stock for investment and not with a view toward resale or distribution to the public and, if so requested by the Corporation, shall deliver to the Corporation a written statement to that effect satisfactory to the Corporation. Additionally, if so requested by the Corporation, the Grantee will execute and deliver to the Corporation a written agreement that the Grantee will not sell or offer to sell any such shares of Stock unless a registration statement shall be in effect with respect to such shares of Stock under the Securities Act and any applicable state securities law or unless the Grantee shall have furnished to the Corporation an opinion, in form and substance satisfactory to the Corporation, of legal counsel acceptable to the

Case 3:07-cv-04874-TEH     Document 15     Filed 01/21/2008     Page 76 of 90

Corporation, that such registration is not required. Furthermore, the Corporation shall have the right to require the Grantee to enter into such stockholder or other related agreements as the Corporation deems necessary or appropriate under the circumstances as a condition to the issuance of any shares of Stock under this Award.

b. The Grantee acknowledges that there may be adverse tax consequences upon the vesting of the Restricted Stock or disposition of the shares of Stock once vested, and that the Grantee should consult a tax advisor prior to such time.

c. The issuance and transfer of shares of Stock shall be subject to compliance by the Corporation and the Grantee with all applicable requirements of securities laws and with all applicable requirements of any stock exchange on which the Stock may be listed at the time of such issuance or transfer. The Grantee understands that the Corporation is under no obligation to register or qualify the Stock with the Securities and Exchange Commission ("SEC"), any state securities commissions or any stock exchange to effect such compliance.

## 9. PAYMENT OF WITHHOLDING TAX.

a. Subject to clause 9(b), upon the vesting of the Grantee's Award, the Grantee shall be required to pay to the Corporation (in cash or cash equivalent) the amount of any federal, state or local taxes of any kind which the Corporation shall be required to withhold with respect thereto. In the event that either (i) Grantee fails to notify the Corporation at least five business days prior to any Vesting Date that Grantee intends to pay to the Corporation the amount of any federal, state or local taxes of any kind which the Corporation shall be required to withhold with respect to the shares of Restricted Stock vesting on such Vesting Date or (ii) Grantee fails to provide timely payment (in cash or cash equivalent) of all sums required by the Corporation pursuant to this Section 9(a), the Corporation shall have the right and option, but not the obligation, to treat such failure as an election by Grantee to provide all or any portion of such required payment by means of tendering vested shares of Restricted Stock having a Fair Market Value equal to the amount of the tax withholding obligation, as determined by the Corporation; provided, however, that in no event shall Grantee be deemed to be tendering a number of shares of Restricted Stock having a value exceeding the minimum amount of tax required to be withheld by law.

b. If the Grantee properly elects, within thirty (30) days of the Date of Grant, to include in gross income for federal income tax purposes an amount equal to the Fair Market Value as of the Date of Grant of the shares of Restricted Stock granted hereunder pursuant to Section 83(b) of the Code (a "Section 83(b) Election"), the Grantee shall pay to the Corporation in the year of such grant, any federal, state or local taxes required to be withheld with respect to such shares. If the Grantee fails to make such payments, the Corporation shall, to the extent permitted by law, have the right to deduct from any payment of any kind otherwise due to the Grantee any federal, state or local taxes of any kind required by law to be withheld with respect to such shares of Stock. The Grantee agrees to provide a copy of such election to the Corporation within ten (10) days after filing the election with the Internal Revenue Service. Exhibit A contains a suggested form of Section 83(b) Election.

## 10. FORFEITURE FOR FRAUD, DISHONESTY, UNLAWFUL COMPETITION AND OTHER HARMFUL ACTS.

A. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT AND IN ADDITION TO THE RESTRICTIONS CONTAINED IN SECTION 2 OF THIS AGREEMENT, ALL UNVESTED RESTRICTED STOCK SHALL BE IMMEDIATELY FORFEITED IF: (i) THE COMMITTEE DETERMINES THAT THE GRANTEE ENGAGED IN ILLEGAL ACTS,

FRAUD, DISHONESTY, WILLFUL MISCONDUCT OR OTHER INTENTIONAL CONDUCT DETRIMENTAL TO THE CORPORATION, INCLUDING VIOLATION OF THE CORPORATION'S INSIDER TRADING POLICY (EACH AN "*IMPROPER ACT*"); (ii) THE GRANTEE'S EMPLOYMENT BY THE CORPORATION IS TERMINATED FOR CAUSE AND THE GRANTEE HAS COMMITTED IMPROPER ACTS; (iii) THE GRANTEE HAS AT ANY TIME DISCLOSED TO ANY PERSON, FIRM, CORPORATION OR OTHER ENTITY ANY OF THE CORPORATION'S PROPRIETARY INFORMATION (AS DEFINED BELOW) WITHOUT THE EXPRESS WRITTEN CONSENT OF THE BOARD, OR EXCEPT AS SUCH DISCLOSURE MAY HAVE BEEN REQUIRED IN CONNECTION WITH THE GRANTEE'S SERVICE AS AN EMPLOYEE OF THE CORPORATION OR BY LAW; (iv) THE GRANTEE SOLICITS OR OTHERWISE INDUCES ANY EMPLOYEE OF THE CORPORATION TO TERMINATE HIS EMPLOYMENT; (v) THE GRANTEE SOLICITS BUSINESS FROM ANY OF THE CORPORATION'S CUSTOMERS WITH WHOM THE GRANTEE HAS A RELATIONSHIP OR THE IDENTITY OF WHOM BECAME KNOWN TO THE GRANTEE BY REASON OF THE GRANTEE'S RELATIONSHIP WITH THE CORPORATION, FOR AND ON BEHALF OF ANY OF THE CORPORATION'S COMPETITORS; (vi) THE GRANTEE DISPARAGES THE CORPORATION OR COMMITS ANY OTHER ACT OF DISLOYALTY; (vii) THE GRANTEE ENGAGES IN ANY CONDUCT IN VIOLATION OF THE GRANTEE'S CONTRACTUAL OBLIGATIONS TO THE CORPORATION, INCLUDING BUT NOT LIMITED TO A VIOLATION OF ANY VALID NON- COMPETITION, NON-DISCLOSURE, NON-SOLICITATION OR OTHER AGREEMENT; (viii) THE GRANTEE FAILS TO ASSIGN TO THE CORPORATION ANY PATENT, COPYRIGHT, TRADEMARK OR OTHER INTELLECTUAL PROPERTY RIGHT IN VIOLATION OF ANY OF THE CORPORATION'S POLICIES OR ANY AGREEMENT BETWEEN THE CORPORATION AND THE GRANTEE; OR (ix) THE GRANTEE REFUSES TO BE AVAILABLE FOR REASONABLE CONSULTATION WITH RESPECT TO THE SUBJECT MATTER OF THE GRANTEE'S EMPLOYMENT OR ENGAGEMENT FOLLOWING TERMINATION OF SUCH EMPLOYMENT. THE ACTS OR CIRCUMSTANCES DESCRIBED IN THE PRECEDING SENTENCE SHALL BE REFERRED TO AS "*EVENTS OF FORFEITURE*".

B. FOR PURPOSES OF THIS SECTION, THE TERM "*PROPRIETARY INFORMATION*" SHALL MEAN ALL CONFIDENTIAL OR SECRET CUSTOMER LISTS, PROSPECTIVE CUSTOMER LISTS, TRADE SECRETS, PROCESSES, PRODUCT FORMULATIONS, INVENTIONS, IMPROVEMENTS, MANUFACTURING FORMULATION OR SYSTEMS TECHNIQUES, PRODUCT FORMULAS, DEVELOPMENT OR EXPERIMENTAL WORK, WORKS IN PROCESS, BUSINESS, MARKETING AND COMPETITIVE STRATEGIES, INFORMATION RELATING TO ANY PATENT, TRADEMARK OR OTHER INTELLECTUAL PROPERTY RIGHT OF THE CORPORATION, AND ANY OTHER SECRET OR CONFIDENTIAL PROPRIETARY MATTER RELATING TO OR PERTAINING TO THE CORPORATION OR ITS PRODUCTS, SERVICES, SALES OR BUSINESS.

C. IN ADDITION TO THE FOREGOING RIGHTS AND ANY AND ALL OTHER RIGHTS WHICH THE CORPORATION (OR ANY OF ITS SUBSIDIARIES OR AFFILIATES) MAY HAVE AGAINST THE GRANTEE AT LAW OR IN EQUITY, THE GRANTEE FURTHER AGREES THAT UPON THE OCCURRENCE OF ANY OF THE EVENTS OF FORFEITURE DESCRIBED IN SUBSECTION A, UPON THE DETERMINATION OF THE COMMITTEE, THE GRANTEE SHALL OWE THE CORPORATION THE FAIR MARKET VALUE OF THE RESTRICTED STOCK (MEASURED AS OF THE DATE THE RESTRICTIONS THEREON LAPSED) OF ALL SHARES VESTED WITHIN THE THREE (3) YEARS PRECEDING THE COMMITTEE'S DETERMINATION THAT AN EVENT OF FORFEITURE HAS OCCURRED. THE GRANTEE SHALL PAY SUCH AMOUNT TO THE CORPORATION WITHIN THIRTY (30) DAYS OF THE COMMITTEE'S WRITTEN DETERMINATION THAT AN EVENT OF FORFEITURE HAS OCCURRED, WHICH DETERMINATION MAY BE MADE BY NOTICE TO THE GRANTEE WITHIN ANY TIME UP TO TWO (2) YEARS FOLLOWING THE GRANTEE'S TERMINATION OF CONTINUOUS SERVICE.

D. BY ACCEPTING THIS AGREEMENT, THE GRANTEE CONSENTS TO DEDUCTION FROM ANY AMOUNTS THE CORPORATION MAY OWE TO THE GRANTEE FROM TIME TO TIME (INCLUDING AMOUNTS OWED TO THE GRANTEE AS WAGES OR OTHER COMPENSATION, FRINGE BENEFITS, VACATION PAY OR COMMISSIONS) TO THE EXTENT OF ANY AMOUNT WHICH THE GRANTEE OWES THE CORPORATION PURSUANT TO THE PROVISIONS OF SUBSECTION C. WHETHER OR NOT THE CORPORATION ELECTS TO MAKE ANY SET-OFF IN WHOLE OR IN PART, IF THE CORPORATION DOES NOT RECOVER BY MEANS OF THE SET- OFF THE FULL AMOUNT OWED TO IT BY THE GRANTEE, THEN THE GRANTEE AGREES TO PAY IMMEDIATELY THE UNPAID BALANCE TO THE CORPORATION.

E. THE GRANTEE MAY BE RELEASED FROM THE GRANTEE'S OBLIGATIONS UNDER THIS SECTION 10 ONLY IF THE COMMITTEE DETERMINES, IN ITS SOLE DISCRETION, THAT SUCH A RELEASE IS IN THE BEST INTERESTS OF THE CORPORATION. SO LONG AS THEY ARE MADE IN GOOD FAITH, ALL DETERMINATIONS BY THE COMMITTEE MADE PURSUANT TO THIS SECTION 10 SHALL BE FINAL, BINDING AND NON-APPEALABLE.

11.**MANDATORY ARBITRATION.** In consideration of the terms and conditions set forth herein, including the Corporation's grant to the Grantee of the Award described above, the Grantee and the Corporation voluntarily promise and agree to arbitrate any and all claims and disputes covered by this Agreement. The arbitration shall be binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("**AAA**") and the National Rules for the Resolution of Employment Disputes ("**Employment Dispute Rules**") in effect on the date the arbitration is commenced in accordance with this Agreement. The AAA's Employment Dispute Rules shall govern disputes concerning the term or termination of the Grantee's employment; all federal, state, or local laws, regulations, statutes, or policies prohibiting employment discrimination and/or harassment (including, without limitation, discrimination or harassment based on race, sex, national origin, religion, age, or disability) and/or unlawful retaliation in termination of employment in violation of any public policy; any policy, compensation, or benefit plan of the Corporation, excluding the Plan; and claims for personal, emotional or physical injury not otherwise governed by Workers' Compensation. The Commercial Arbitration Rules of the AAA shall govern all other disputes covered by this Agreement, including, without limitation, disputes relating to the Plan. The provisions of this Agreement shall govern the rights of all parties hereto, including but not limited to any party claiming for or on behalf of the Grantee, including the Grantee's heirs, successors, assigns, personal representatives and bankruptcy trustees. The Grantee and the Corporation further agree that binding arbitration pursuant to this Agreement shall be the sole, exclusive, and final remedy for resolving any such claims and disputes.

A. **CLAIMS COVERED BY MANDATORY ARBITRATION AGREEMENT.** With the exception of only those claims specifically excluded in paragraph B, below, this Agreement includes all legally actionable claims that the Grantee may currently, or in the future, have against the Corporation, including without limitation, claims arising under:

1. any alleged or actual contract, agreement, or covenant (oral, written, or implied), including this Agreement, between the Grantee and the Corporation relating to the Grantee's employment, the termination of the Grantee's employment, directorship and/or consultancy or an Award provided to the Grantee;

2. any policy, compensation, or benefit plan of the Corporation, including the Plan, unless the decision at issue was made by an entity other than the Corporation, in which case the agreement that arbitration is the exclusive remedy applies only to the Grantee's claims against the Corporation;

3. all federal, state, or local laws, regulations, statutes, or policies prohibiting employment discrimination and/or harassment, (including, without limitation, discrimination or harassment based on race, sex, national origin, religion, age, or disability) and/or unlawful retaliation;

4. any public policy;

5. any and all claims for personal, emotional, physical, or economic injury;

6. any other rights, obligations, or duties arising out of constitutions, statutes or common law, whether or not specifically referred to in this Agreement, and whether similar to or dissimilar to rights, obligations, or duties referred to in this Agreement, which are or may be granted to any party to this Agreement by the laws of any state or country in which either party resides or engages in the business of the Corporation.

B. **CLAIMS EXCLUDED FROM ARBITRATION AGREEMENT.** The only claims not subject to Arbitration under this Agreement are limited to:

1. any claim by the Grantee for workers' compensation benefits;

2. any claim by the Grantee for benefits under a benefit plan of the Corporation which provides its own arbitration procedure;

3. any claim by a party involving violation of rules, regulations, or laws governing insider trading;

4. any claim prohibited from binding arbitration by applicable laws or public policy; and

5. any claim brought before the Equal Employment Opportunity Commission, however, notwithstanding the foregoing, the Grantee agrees that the Grantee's sole recovery for any damages shall be through the binding arbitration process described herein.

C. **PROCEDURES.**

1. A written request for mediation/arbitration which contains a specific statement of the acts complained of and the statutory or other violation alleged, must be served by mail on the other party, and in duplicate (with a copy of this Agreement attached) on the AAA Office in Phoenix, Arizona or the AAA regional office in which Phoenix is located. The Corporation shall be served at its principal place of business, and the Grantee shall be served at the last home address shown in his/her personnel file. The request shall set forth the names, addresses, and telephone numbers of the parties; the amount in controversy, if any; the remedy sought; and that the hearing location agreed upon is Phoenix, Arizona. The request must be filed within the time limit established by the applicable statute of limitations necessary to perfect an administrative claim or initiate a lawsuit, whichever is sooner, if the dispute involves statutory rights, and when statutory rights are not at issue, within one year of the day on which the act complained of occurred, or notice thereof was given, whichever occurs first.

2. The parties shall attempt in good faith to select one person by agreement to mediate the dispute. The mediator, after consultation with the parties, will determine

the mediation procedures to be followed. The fees and expenses of the mediator, if any, will be paid by the Corporation. If no mutual agreement can be reached as to such person, then the dispute will be settled by binding arbitration under the procedures set forth below. No mediation shall exceed two hours without the Corporation's written agreement to lengthen the mediation. Mediation is not binding on either party.

3. If the dispute is not resolved by discussion or mediation within thirty (30) days of the request for mediation/arbitration, the AAA shall administer the arbitration. The AAA shall appoint an arbitrator within thirty (30) days of the AAA's receipt of notice that the matter was not, or will not be, resolved through mediation. The arbitrator must be licensed to practice law in the state in which the arbitration is convened, and the arbitrator shall, by virtue of background and similar experience, be knowledgeable in matters pertaining to restricted stock award agreements and employment relationships and disputes.

4. The arbitrator may establish rules for the conduct of the arbitration consistent with the terms of this agreement and the applicable AAA rules. Each party shall have the presumptive right to take two (2) depositions at their own expense. The arbitrator may order additional depositions for good cause shown and such other discovery as the arbitrator considers necessary. Each party shall be entitled to counsel of its choice. All proceedings shall be deemed private and confidential and shall not be disclosed to the public by either the arbitrator or the parties to the arbitration, except as required by legal process or as necessary to judicially challenge an arbitration award under the grounds set forth below. The arbitrator shall have the authority to entertain motions to dismiss and/or motions for summary judgment by any party and shall apply the standards governing such motions under the Federal Rules of Civil Procedure.

5. In arbitrations governed by the Commercial Arbitration Rules of the AAA, not earlier than thirty (30) nor more than forty-five (45) days after appointment, the arbitrator shall conduct a preliminary hearing in accordance with the AAA "Guidelines for Expediting Large, Complex Commercial Arbitrations." Not less than five (5) days prior to the preliminary hearing, all parties to the arbitration shall serve upon all other parties to the arbitration a written list of witnesses and exhibits to be used in the arbitration hearing. Except for good cause shown, no witness or exhibit may be utilized at the arbitration hearing other than those set forth on such list. The arbitrator shall have the power to compel production of documents at the hearing by subpoena. Each party shall be entitled to counsel of its choice. All proceedings and information provided at the hearings shall be deemed private and confidential and shall not be disclosed to the public by either the arbitrator or the parties to the arbitration. The arbitrator shall have the authority to entertain motions to dismiss and/or motions for summary judgment by any party and shall apply the standards governing such motions under the Federal Rules of Civil Procedure.

6. Also in arbitrations governed by the Commercial Arbitration Rules, the arbitrator shall receive evidence in a single hearing which shall be conducted in Phoenix, Arizona. The hearing shall commence not more than sixty (60) days after the appointment of the arbitrator.

7. In arbitrations governed by the Employment Dispute Rules, the arbitrator shall conduct an Arbitration Management Conference with the parties not later than sixty (60) days after appointment, and shall thereafter conduct the Arbitration in Phoenix, Arizona at a time and date set after consultation with the parties during the Management Conference.

8. The arbitrator shall issue such award as is proper under the applicable substantive law of Arizona or of the United States, as the case may be, and the evidence. The arbitrator shall have no power or authority to add to or, except as otherwise provided in Section D.4 hereof, to detract from the Agreement of the parties. The arbitrator shall not have authority to alter the terms or conditions of employment lawfully established by the Corporation, nor modify or disregard the standards of professional conduct and performance set by the Corporation in good faith, but shall only determine whether the law has been violated by the acts of either party as specifically alleged.

9. The arbitrator shall issue a final award not more than twenty (20) days following the conclusion of the hearing. The arbitrator shall have authority to grant injunctive relief in a form substantially similar to that which would otherwise be granted by a court of law. The arbitrator shall issue a written opinion setting forth a statement of the grounds for the award and the method of determining damages, if any, awarded. The award shall be final and binding on all parties and may be entered as a judgment, under seal, and enforced, or injunctive relief maybe sought, in any court of competent jurisdiction. Judicial modification of the award shall be limited to situations in which the arbitrator fails or refuses to apply controlling law or the valid and enforceable terms of this Agreement.

10. The arbitrator shall be entitled to receive reasonable compensation at an hourly rate to be established by agreement between the arbitrator and the AAA. All fees and expenses of the arbitration, including a transcript if either party requests, will be borne by the parties equally, except that in arbitrations governed by the Employment Dispute Rules, the fees and expenses will be borne by the parties as follows: The Grantee shall pay an amount equivalent to the filing fee in Arizona District Court, plus one-half of the expense of the transcript, and any other amounts deemed fair and reasonable by the arbitrator; the Corporation shall bear the remaining fees and expenses of the arbitration. Each party will pay for the fees and expenses of its own attorneys, experts, witnesses and the presentation of proof and post- hearings briefs, unless the party prevails on a claim for which attorneys' fees are recoverable by statute or contract, and the arbitrator awards such fees.

11. Either party may bring an action in a court of competent jurisdiction to compel arbitration under this Agreement, to seek to vacate an arbitration award, and to enforce an arbitration award. Except as otherwise provided in this Agreement, the Grantee agrees that the Grantee will not initiate or prosecute any lawsuit in any way related to any claim covered by this Agreement.

D. **MISCELLANEOUS PROVISIONS.** For the purposes of the arbitration provisions of this Agreement:

1. Notice will be effective on the fifth (5th) day after deposit with the United States Postal Service by certified mail, return receipt requested, properly addressed and with first class postage paid.

2. The term "Corporation" includes all related entities, all directors, officers, employees, agents, representatives, benefit plans, benefit plan sponsors, fiduciaries, administrators, or affiliates of any of the above, and all successors and assigns of any of the above excluding the Grantee.

3. If either party pursues a covered claim against the other by action, method or legal proceeding other than arbitration as provided herein, the responding party shall be

entitled to dismissal or injunctive relief regarding such action and shall be entitled to recover all costs, losses, and attorneys' fees related to such other action or proceeding.

4. This is the complete agreement of the parties on the subject of arbitration of disputes covered by this Agreement. This Agreement supersedes any prior or contemporaneous oral, written or implied understanding on the subject, shall survive the termination of the Grantee's employment, and can only be revoked or modified by a writing signed by the parties which specifically states an intent to revoke or modify this Agreement. If any provision, or term in a provision, of this Agreement is adjudged to be void or otherwise unenforceable in whole or in part, such adjudication shall not affect the validity of the remainder of the Agreement. To the extent that any provision of this Agreement is held invalid or unenforceable because it is overbroad, that provision shall not be void but shall be limited only to the extent required by applicable law and enforced as so limited.

5. This Agreement is not, and shall not be construed to create, any contract of employment, express or implied, nor does this Agreement in any way alter the "at will" status of the Grantee's employment.

## 12. **MISCELLANEOUS.**

a. This Award shall be subject in all respects to the terms of the Plan which shall be incorporated herein by reference, and the Award shall be interpreted in accordance with the Plan. The Committee shall interpret and construe the Plan and this Agreement, and its interpretations and determinations shall be conclusive and binding on the parties hereto and any other person claiming an interest hereunder, with respect to any issue arising hereunder or thereunder. In the event of a conflict or inconsistency between the terms and provisions of the Plan and the provisions of this Agreement, the Plan shall govern and control. All capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

b. The masculine pronoun shall be deemed to include the feminine, and the singular number shall be deemed to include the plural unless a different meaning is plainly required by the context.

c. Every provision of this Agreement is intended to be severable, and any illegal or invalid term shall not affect the validity or legality of the remaining terms.

d. This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original, but all such counterparts shall together constitute the same instrument.

e. The Grantee acknowledges that the Grantee is, and at all times will be, an employee-at-will of the Corporation, and nothing contained herein shall be construed to alter or affect the Grantee's at-will employment status. The Grantee acknowledges that the Grantee's at- will status can be modified only by a written contract which (a) sets forth an express restriction on the Grantee's at-will status; (b) is signed by both the Grantee and the President of the Corporation; and (c) expresses the specific intent that it is a contract of employment intended to modify the Grantee's at-will status. The Grantee's Continuous Service is terminable by the Corporation or by the Grantee, with or without cause, and with or without notice, at any time. In the event of the termination of the Grantee's Continuous Service, the Corporation shall have no liability to the Grantee, other than to pay the Grantee the compensation due through the Grantee's last day of employment or other service, and such termination shall not diminish or affect the enforceability of this Agreement.

f. This Agreement shall be administered, interpreted and enforced under the internal laws of the state of Delaware, without giving effect to the conflicts of law principles thereof. Any arbitration, application for injunctive relief, or litigation relating to the Agreement shall be filed and conducted in Maricopa County, Arizona.

g. The Corporation's failure to enforce at any time any provision of this Agreement or to require at any time performance by the Grantee of any of the provisions hereof shall in no way be construed to be a waiver of such provisions or to affect either the validity of this Agreement, or any part hereof, or the right of the Corporation thereafter to enforce each and every provision in accordance with the terms of this Agreement.

UPON ENTERING INTO THIS AGREEMENT, THE GRANTEE WARRANTS THAT HE HAS CAREFULLY READ THIS AGREEMENT, UNDERSTANDS ITS TERMS, AND HAS VOLUNTARILY AGREED TO ENTER INTO IT WITHOUT RELIANCE ON ANY REPRESENTATIONS OR PROMISES BY THE CORPORATION OTHER THAN AS SET FORTH IN THIS AGREEMENT.

THE GRANTEE HAS HAD SUFFICIENT OPPORTUNITY BEFORE SIGNING THE AGREEMENT TO ASK ANY QUESTIONS THE GRANTEE HAS ABOUT THE AGREEMENT AND HAS RECEIVED SATISFACTORY ANSWERS TO ALL SUCH QUESTIONS.

THE GRANTEE UNDERSTANDS THE GRANTEE'S RIGHTS AND OBLIGATIONS UNDER THIS AGREEMENT AND VOLUNTARILY ENTERS INTO IT.

THE GRANTEE ACKNOWLEDGES THE GRANTEE'S "AT-WILL" EMPLOYMENT STATUS.

THE GRANTEE RECOGNIZES THE GRANTEE'S WAIVER OF RIGHT TO A JURY TRIAL BY AGREEING TO MANDATORY ARBITRATION.

THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION. THE ARBITRATION PROVISION MAY BE ENFORCED BY THE CORPORATION AND BY THE GRANTEE.

**IN WITNESS WHEREOF** , the parties hereto have caused this Agreement to be executed on the day and year first above written.

**MEDICIS PHARMACEUTICAL CORPORATION**

By:  /s/ Jonah Shacknai


**GRANTEE**

By:

# MEDICIS PHARMACEUTICAL CORPORATION
## 2004 STOCK INCENTIVE PLAN

### Exhibit A

### Section 83(b) Election Form

Attached is an Internal Revenue Code Section 83(b) Election Form. **IF YOU WISH TO MAKE A SECTION 83(B) ELECTION, YOU MUST DO SO WITHIN 30 DAYS AFTER THE DATE THE SHARES OF RESTRICTED STOCK COVERED BY THE ELECTION WERE TRANSFERRED TO YOU.** In order to make the election, you must completely fill out the attached form and file one copy with the Internal Revenue Service office where you file your tax return. In addition, one copy of the statement also must be submitted with your income tax return for the taxable year in which you make this election. Finally, you also must submit a copy of the election form to the Corporation within 10 days after filing that election with the Internal Revenue Service. A Section 83(b) election normally cannot be revoked.

## MEDICIS PHARMACEUTICAL CORPORATION
## 2004 STOCK INCENTIVE PLAN

### Election to Include Value of Restricted Stock in Gross Income in Year of Transfer Under Internal Revenue Code Section 83 (b)

Pursuant to Section 83(b) of the Internal Revenue Code, I hereby elect within 30 days after receiving the property described herein to be taxed immediately on its value specified in item 5 below.

1. The name, address and taxpayer identification number of the undersigned taxpayer are:

_____

_____

_____

S.S.N. or
T.I.N.:    _____

The name, address and taxpayer identification number of the taxpayer's spouse are (complete if applicable):

_____

_____

_____

S.S.N. or
T.I.N.:    _____

2. Description of the property with respect to which I am making this election:

_____ shares of common stock of Medicis Pharmaceutical Corporation (the "*Restricted Stock* ").

3. The shares of Restricted Stock were transferred to me on _____ ___, 200__.

4. This election relates to the 200__ calendar taxable year.

5. The shares of Restricted Stock are subject to the following restrictions:

The shares of Restricted Stock may not be transferred and are subject to forfeiture in the event of my termination of employment with Medicis Pharmaceutical Corporation and its subsidiaries (the "*Restrictions* "). The Restrictions will lapse in a series of annual installments over a five (5)-year period ending on _____, 20__.

6. Fair market value:

The fair market value at the time of transfer (determined without regard to any restrictions other than restrictions which by their terms will never lapse) of the shares of Restricted Stock with respect to which I am making this election is $_____ per share.

7. Amount paid for Restricted Stock:

The amount I paid for the Restricted Stock is $____ per share.

8. Furnishing statement to employer:

A copy of this statement has been furnished to my employer, Medicis Pharmaceutical Corporation. If the transferor of the Restricted Stock is not my employer, that entity also has been furnished with a copy of this statement.

Dated: _____     Taxpayer
                           Signature     _____

The undersigned spouse of taxpayer joins in this election. (Complete if applicable).

Dated: _____     Spouse
                           Signature     _____

By accepting this grant, I acknowledge that I have read all the required documents and agree to all terms and conditions. I acknowledge that my acceptance or rejection of this award constitutes my electronic signature and will provide the same authority as my formal written signature.

☒ ☒

EXHIBIT 6



**Fox Rothschild** LLP
**ATTORNEYS AT LAW**

235 Pine Street, Suite 1500
San Francisco, CA 94104-2734
Tel 415.364.5540  Fax 415.391.4436
www.foxrothschild.com

September 27, 2007

## VIA FACSIMILE (415-512-2001) & U.S. MAIL

G. Whitney Leigh, Esq.
Gonzalez & Leigh LLP
Two Shaw Alley, Third Floor
San Francisco, California 94104

Re:   *Kimberlea McManigal v. Medicis Pharmaceutical Corp., et al.*
      Case No. CGC-07-465398

Dear Mr. Leigh,

    This letter is to confirm our telephone conversation of yesterday afternoon regarding your letter of September 20, 2007. I informed you that the arbitration agreement signed by your client was signed electronically. In addition, I advised you that Medicis still wishes to pursue arbitration and is willing to waive those provisions of the arbitration agreement that are inconsistent with the holding of *Armendariz v. Foundation Health Psychare Servs,. Inc.*, 24 Cal. 4th 83 (2000). You explained that you would consider our conversation and discuss it with co-counsel for Ms. McManigal, Mr. Pearce.

    We look forward to hearing from you.

Very truly yours,

Cristina K. Olivella

WCI 13956v1 09/26/07

A Pennsylvania Limited Liability Partnership

California       Delaware       Florida       Nevada       New Jersey       New York       Pennsylvania

1   DAVID F. FAUSTMAN, State Bar No. 081862
2   CRISTINA K. OLIVELLA, State Bar No. 246156
    FOX ROTHSCHILD LLP
3   235 Pine Street, Suite 1500
    San Francisco, California 94104
4   Tel: 415-364-5540
    Fax: 415-391-4436
5   dfaustman@foxrothschild.com
6   colivella@foxrothschild.com

7   Attorneys for Defendants
    MEDICIS PHARMACEUTICAL CORPORATION and
8   ROBERT NEVIN

9                UNITED STATES DISTRICT COURT

10        FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12  KIMBERLEA MCMANIGAL, an          Case No. 3:07-cv-04874 TEH
13  individual,

14           Plaintiffs,             PROOF OF SERVICE

15  vs.

16

17  MEDICIS PHARMACEUTICAL           Date:  February 25, 2008
    CORPORATION, a Delaware          Time:  10:00 a.m.
18  corporation, ROBERT NEVIN, an    Courtroom: 12
    individual,
19

20           Defendants.

21

22

23

24

25

26

27

28

FOX ROTHSCHILD LLP
1 PINE STREET
11E 1500
SAN FRANCISCO, CA 94104

WCI 2202321/01/21/08

PROOF OF SERVICE

# PROOF OF SERVICE

I am employed in the County of San Francisco, State of California. I am over the age of 18 years and not a party to this action; my business address is: 235 Pine Street, Suite 1500, San Francisco, California 94104.

On January 21, 2008, I served the foregoing **NOTICE OF MOTION AND MOTION FOR ORDER COMPELLING ARBITRATION AND DISMISSING THE ACTION, OR ALTERNATIVELY, STAYING ACTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION; DECLARATIONS OF DEBI HEILEMAN, CRISTINA OLIVELLA, AND EXHIBITS 1 – 6** on the interested party in this action via electronic filing. On January 22, 2008, I placed true copies thereof enclosed in sealed envelopes addressed as follows:

G. Whitney Leigh, Esq.
GONZALEZ & LEIGH LLP
Two Shaw Alley, Third Floor
San Francisco, California 94105

Juan Enrique Pearce, Esq.
PEARCE LAW OFFICES
530 Jackson Street, Second Floor
San Francisco, California 94113

[ x ]  **BY FIRST CLASS MAIL:** I caused said documents to be deposited in a facility regularly maintained by the United States Postal Service on the same day, in a sealed envelope, with postage paid, addressed to the above listed persons on whom it is being served in San Francisco, California for collection and mailing on that date following ordinary business practices.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 21 day of January 2008 at San Francisco, California.

_/s/ Amie Morelli_____.
Amie Morelli

)N ROTHSCHILD LLP
 PINE STREET
ITE 1500
N FRANCISCO, CA 94104

WC1 22032v1 01/21/08